John P. MALABARBA, Plaintiff–Appellant,

v.

CHICAGO TRIBUNE COMPANY, Defendant–Appellee.

No. 97–2707.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 12, 1998.

Decided July 22, 1998.

Debra K. Marcus (argued), Argy Koutsikos, Pappas, Power & Marcus, Chicago, IL, for Plaintiff–Appellant.

John W. Powers (argued), Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, for Defendant–Appellee.

Before BAUER, COFFEY, and KANNE, Circuit Judges.

COFFEY, Circuit Judge.

The plaintiff-appellant, John Malabarba, appeals from the district court's entry of summary judgment in favor of the defendant-appellee, Chicago Tribune Company ("Tribune"), on his claim that the Tribune failed to reasonably accommodate his disability and terminated his employment, in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"). Malabarba contends that the trial judge erred in finding that he was not a "qualified individual with a disability" within the meaning of the ADA, that he was provided with reasonable accommodations to perform his job, and that he was not discharged because of his disability. We affirm.

## I. BACKGROUND

There is an old adage among lawyers that, when the law is not on your side, you should attempt to confuse the court or jury with your spin on the facts. When one engages in this practice on appeal, it regrettably makes the court's task of resolving disputes all the more time-consuming and difficult. Malabarba has submitted a very lengthy recitation of his edited version of

the facts in this case. We are now called upon to do the work of distinguishing the undisputed facts from those which are disputed in reviewing the grant of summary judgment. Unfortunately, Malabarba's Local Rule 12 response to the Tribune's statement of uncontested facts falls short in flagging the allegations with which he agrees versus those he disputes. For this reason, the Tribune filed a motion in the district court to strike Malabarba's Rule 12(N) statement. The trial judge denied the Tribune's motion, notwithstanding her belief that "the court would be justified in granting [it]" because, among other reasons, "Malabarba is argumentative and unresponsive [and] ... goes on for pages making factual assertions and legal arguments that do not contradict the Tribune's statements." *See Guzzo v. Northeast Illinois Regional Railroad Corp.*, No. 94–C5813, 1996 WL 131730, at *1 (N.D.Ill. March 15, 1996) (A Rule 12 statement "must be limited to a concise statement of uncontested facts. Opinion, suggested inferences, legal arguments and conclusions" are improper.); *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir.1994) (explaining that "district courts are not obliged in our adversary system to scour the record looking for factual disputes...."). The court did find that, because Malabarba failed to deny a number of the Tribune's allegations, he in effect admitted them. *See Bourne Co. v. Hunter Country Club, Inc.*, 990 F.2d 934, 938 (7th Cir.1993) (district court correctly held that defendant admitted facts in Rule 12(m) statement by failing to deny them). The court also rejected several of Malabarba's factual responses, ruling that they were unsupported in the record. Malabarba now attempts to reargue his opposition to certain facts that the district judge concluded were admitted, and restates other facts as if they were undisputed, even though the judge found them to have been without a basis in the record. Local Rule 12 does not lose its

efficacy once a case moves from the trial arena to the appellate stage of litigation; we, too, "endorse[ ] the *exacting obligation* [Rule 12] ... impose[s] on a party contesting summary judgment to highlight which factual averments are in conflict." *Waldridge*, 24 F.3d at 921–22 (emphasis added). That having been said, we shall limit the ensuing discussion to those facts which the parties' Rule 12 statements reflect are clearly undisputed and are supported in the record.

The Chicago Tribune, a Delaware corporation with its principal place of business in Chicago, Illinois, prints and distributes a daily newspaper. In 1972, the Tribune hired Malabarba as a mailer, and he worked in that capacity until July of 1985, when he "walked out" during a labor strike. Five years later, in August 1990, Malabarba was re-hired by the Tribune to work in its packaging department as a packager,[1] a position which, according to both parties, is one of the most physically demanding within the company. Indeed, the packager job "[r]equires physical dexterity to lift and move material," the ability "to stand for long periods of time[,] ... to lift or pile newspaper products that vary in weight from five to thirty-five pounds or more," and "to help remove paper jams in conveyors at various height levels which includes climbing on ladders." All packagers are assigned to one of two "teams" within the packaging department-press support or inserting machine support.[2] Every packager on each team, in turn, rotates through the various duties attendant to the press or inserting machine. The required physical skills for working on either team reflect those set forth in the general packager job description, quoted above. Packagers also periodically fill in as needed for the packaging department control room operator (i.e., whenever he or she breaks for lunch, is on vacation or sick leave, etc.); this is considered to be sedentary, "light-duty" work.[3]

1. Malabarba stated at his deposition that the duties of a packager and mailer are virtually identical.

2. An inserting machine is used to "insert" the various sections of a newspaper into a single complete edition.

3. Both the district court and the parties make frequent reference to "light-duty" work. For the sake of consistency, we shall use the term "light-duty" in its generic sense to denote the types of tasks Malabarba was capable of performing at the Tribune.

On April 28, 1991, approximately eight months after going back to work at the Tribune, Malabarba injured his back while attempting to remove newspaper bundles from a printing press. As a result of this injury, he took a leave of absence until September of 1991, when Dr. Michael Schafer, Malabarba's orthopedic surgeon, and Dr. John Marquardt, the Tribune's medical director, both cleared him to return to his packager position without physical restriction. Then, on April 27, 1992, Malabarba once again injured his back while piling bundles coming off the press, and was once again granted a leave of absence.[4] Doctors Marquardt and Schafer released him to work in September 1992, but this time placed limitations on the types of tasks he could perform—he was prohibited from standing for over thirty minutes without a break, bending at the waist, twisting his torso, or lifting anything weighing more than ten pounds. Malabarba admits that these restrictions on his physical activity prevented him from working on the inserting machines and presses. And, in fact, Dr. Marquardt instructed Malabarba that he was to confine his duties to helping out in the control room.[5]

Upon Malabarba's return to the packaging department in September of 1992, he was assigned to assist the second-shift control room operator, Minnie Hayes. Hayes took disability leave beginning in November 1992, at which time Malabarba covered for her on a full-time basis. When Hayes came back to work the following March, Malabarba helped out in the control room only occasionally.

With little left for Malabarba to do, Jerry Quarnstrom, the then second-shift operations manager, made up a list of miscellaneous "light-duty" tasks around the packaging department and assigned them to Malabarba.[6] By the Fall of 1993, Tom Gillison had replaced Quarnstrom as the operations manager, and Malabarba had completed most of the job assignments included on Quarnstrom's list. Gillison gave Malabarba other "light-duty" projects, but, as of late 1993, it was evident to the packaging department manager, Steve Weisser, that many of these tasks were both repetitive and unnecessary.

In May 1994, a diabetes-related foot ulcer forced Malabarba to take another leave of absence, his third in less than four years since being re-hired by the Tribune in 1990. He received a medical release to return to work some five months later, in October, and was transferred immediately to the Tribune's remote packaging site, Tribune Packaging West ("TPW"), to work as a material handler.[7] In this capacity, Malabarba's primary charge was to drive a forklift or "jeep" to mechanically load and unload trucks at TPW's receiving dock. Nevertheless, it is uncontested that his physical limitations precluded him from carrying out all the duties of a material handler, including manually lifting empty wooden skids and newspaper bundles, piling the newspaper bundles on skids, and splitting or combining newspaper bundles on the skids.[8] Malabarba's stint at TPW was quite brief, only one month; in November, he fractured his foot while at home and took his fourth medical leave in four years. After he

---

4. Doctor Schafer believed that Malabarba's 1992 back injury was attributable to a degenerative disc disease in the lumbar spine, and degenerative arthritic changes of the facet joints in the lower spine.

5. Malabarba's specific duties while assisting in the control room are not enumerated in the record, although, as previously explained, it is undisputed that they were classified as sedentary in nature.

6. The miscellaneous assignments included, *inter alia:* preparing a daily housekeeping report on the cleanliness of the packaging department; assembling an insert binder so that Malabarba's supervisors could verify that the proper insert was running on the inserting machine; training jeep drivers; and entering production information on a computer. Not only had many of these

ministerial tasks been previously performed by packagers, supervisors, or foremen, but some of them were discontinued after Malabarba was reassigned to work at Tribune Packaging West.

7. Doctor Marquardt was of the belief that Malabarba could work as a materials handler at TPW due to his understanding, albeit an erroneous one, that the position "was ... fairly quiet, sedentary without lifting, bending."

8. The trial judge found that "Malabarba's ... assertion that he was able to fulfill and did fulfill the job responsibilities of ... material handler is completely unsupported by the deposition testimony he cites." We agree, and shall treat this fact as uncontested, accordingly.

was fit with a walking cast, Dr. Marquardt cleared him to return to work at TPW on January 22, 1995. Although the parties dispute whether Malabarba was capable of operating a forklift with his foot casted, the operations manager at TPW, Al Letizia, states that he sent Malabarba home because he was unable to wear safety shoes, as required by Tribune policy.

On February 1, 1995, Malabarba met with Weisser and Audrey Southard, the Tribune's human resources manager. At this meeting, Malabarba described the types of "light-duty" projects to which he had previously been assigned in the packaging department, and expressed a desire to continue working on similar jobs. Weisser and Southard told him he could not be re-assigned to the packaging department because of budget constraints,[9] but that the Tribune would attempt to find him a position compatible with his medical restrictions outside of that department. Shortly thereafter, Southard had Cathlene Johnson, an employment specialist, interview Malabarba to determine the types of jobs for which he was qualified. From her interview, Johnson was of the opinion that Malabarba possessed sound communications and "people skills," as well as an understanding of the Tribune organization as a whole. She informed Malabarba that she would be on the lookout for a position for him, and encouraged Malabarba to check the Tribune's internal job postings for anything that might interest him, which he admits he never did. Johnson also requested other Tribune employment specialists to assist Malabarba in finding a new job within the company.

Later in February 1995, Luis Anaya, one of Johnson's employment specialist colleagues, interviewed Malabarba for a receptionist/back-up secretary position. Unable to type the requisite 65 words per minute and lacking familiarity with the Tribune's word processing software, Malabarba was deemed unqualified for the job. Then, on March 14, 1995, Johnson informed Malabarba that she had found a position for him as a Customer Service Representative II ("CSR II"). Malabarba was advised that he would be required to successfully complete a four-week training course before commencing his employment as a CSR II, and that he would receive worker's compensation benefits to make up two-thirds of the difference in pay between his CSR II salary and that of a packager. Malabarba accepted the position.

Malabarba began the CSR II training program on March 22, 1995. After several classes, Dana Meza, the CSR trainer, informed Malabarba that he would have to improve his performance or he would not pass the course. As of April 14, Malabarba had failed the one-on-one and written portions of the final exam, as well as the classroom environment training program, and was therefore ineligible for the CSR II position. In late April of 1995, Johnson informed Malabarba that the Tribune had no other jobs available at the time matching his qualifications and that his services with the company were terminated.

Malabarba subsequently brought suit against the Tribune, alleging that he was discriminated against on the basis of his disability, in violation of the ADA. The Tribune filed a motion for summary judgment, and the district court granted the same. In the court's view, Malabarba was not a "qualified individual with a disability" under the ADA, and the Tribune had undertaken appropriate steps to reasonably accommodate his disability. Accordingly, it found no violation of the ADA.

## II. ISSUES

Malabarba advances two issues for our review. Initially, he contends that the trial judge erred in concluding that he was not a "qualified individual" within the meaning of the ADA. And secondly, Malabarba asserts that there exist genuine issues of material fact as to whether the Chicago Tribune discharged him because of his disability, thus

---

9. The record reflects that the packaging department was put under tight budget constraints in 1994 due to a drastic increase in the price of newsprint. These cut-backs required Weisser to reduce the size of the packaging department workforce, and to get the most out of each and every one of the full-time employees he retained. It would have been financially impracticable for him to keep Malabarba, who could not perform all the duties of a packager, in the department.

making the grant of summary judgment against him improper.

## III. DISCUSSION

■ We review the district judge's grant of summary judgment in the Chicago Tribune's favor *de novo.* *See Geier v. Medtronic, Inc.,* 99 F.3d 238, 240 (7th Cir.1996). In so doing, the court must construe all facts and inferences in the light most favorable to Malabarba, as the party opposing the motion. *See NLFC, Inc. v. Devcom Mid–America, Inc.,* 45 F.3d 231, 234 (7th Cir.1995). We will affirm the grant of summary judgment only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the parties' affidavits, reveal no genuine issue of material fact and that the moving party, the Chicago Tribune, is entitled to judgment as a matter of law. *See* Fed. R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

### A. *"Qualified Individual" Status under the ADA*

The ADA proscribes discrimination against "a qualified individual with a disability. . . ." 42 U.S.C. § 12112. The district court opined that, while Malabarba raised a genuine issue of material fact as to whether he was "disabled" within the meaning of the ADA, it was undisputed that he could not make the predicate showing of being a "qualified individual" to perform the essential functions of a Tribune packager. *See Nowak v. St. Rita High School,* 142 F.3d 999, 1002–03 (7th Cir.1998). A "qualified individual with a disability" is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

■ On appeal, Malabarba has altered the course of his argument relative to his position in the district court. Having apparently come to terms with the fact that he cannot meet the physical demands of the packager job, with or without reasonable accommodation, Malabarba has shifted gears to contend that a factual dispute exists over the position he held at the time of his discharge from the Tribune packaging department. That is, he raises the question of whether, at the time he was removed from the packaging department, he was a packager doing temporary, "light-duty" work, or a material handler, a position which, in his view, "might be termed" light-duty. The Tribune urges that Malabarba has waived this issue by having failed to sufficiently advance it in the district court. *See Ryan v. Chromalloy American Corp.,* 877 F.2d 598, 603–04 (7th Cir.1989) (" '[A] party opposing a summary judgment motion must inform the trial court of the reasons, legal or factual, why summary judgment should not be entered. If it does not do so, and loses the motion, it cannot raise such issues on appeal.' ") (quoting *McNeil v. Springfield Park District,* 851 F.2d 937, 946 (7th Cir.1988)). While we are of the belief that Malabarba did adequately present the issue to the trial court, and the matter is properly before us, it is our opinion that, for purposes of our analysis under the ADA, Malabarba's qualifications must be measured against the duties of a full-time packager at the Tribune, not a material handler. To hold otherwise would be to depart from this circuit's long-standing recognition that the ADA does not require that employers transform temporary work assignments into permanent positions.

Malabarba relies on two district court cases, *Taylor v. Garrett,* 820 F.Supp. 933 (E.D.Pa.1993), and *Valdez v. Albuquerque Public Schools,* 875 F.Supp. 740 (D.N.M. 1994), for the proposition that a plaintiff alleging an ADA violation need only be qualified to perform the essential functions of the "light-duty" position to which he was reassigned after becoming disabled (i.e., material handler), as opposed to the position for which he was originally hired (i.e., a packager). Because the facts of *Taylor* and *Valdez* are distinguishable from those in the instant appeal, we shall set them forth in greater detail. In *Taylor,* the United States Navy originally hired the plaintiff, Taylor, as a "rigger helper" in 1984 and promoted him to a "rigger worker" position two years later. Taylor injured his back in 1986, and as a consequence, was assigned to a variety of "light-duty" tasks, while retaining his "rig-

ger" job classification. The Navy terminated Taylor's employment in 1989, after having discovered that he allegedly was filing false claims with the government.[10] Taylor brought suit against the Secretary of the Navy under the ADA's predecessor statute, the Rehabilitation Act of 1973, seeking reinstatement to a permanent "light-duty" position. The Navy, in turn, filed a motion for partial summary judgment. It contended that, since Taylor was hired as a rigger and remained classified as a rigger until his termination, the appropriate inquiry was not whether he was qualified to perform the "light-duty" jobs to which he had been assigned following his back injury, but rather whether he could fulfill the duty requirements of a Navy rigger. Taylor, on the other hand, urged that his qualifications were more appropriately measured against the demands of the "light-duty" position he was performing at the time of his discharge. In denying the Navy's summary judgment motion, the trial judge opined that "when an employee *has* been offered light-duty work—work that he must accept in order to maintain workers' compensation eligibility—and that employee challenges the conditions of, and the reasons for his separation from, such light-duty work, the relevant inquiry must be his qualifications to perform that work in which he was engaged when the alleged discrimination occurs." *Taylor*, 820 F.Supp. at 938 (emphasis in original).

The court in *Valdez* reached a similar result. There, the Albuquerque Public Schools ("APS") hired Valdez in 1974 to work as an equipment operator. Valdez injured his right arm in a 1979 motorcycle accident. By 1992, his damaged arm had deteriorated to such an extent that he was no longer capable of performing many of the essential functions of an equipment operator. As a result, APS significantly increased Valdez's involvement as supervisor of the Community Service Program ("CSP"), which is a "light-duty" position. Valdez supervised the CSP on a full-

time basis for almost two years. Ultimately, however, APS gave Valdez the choice of either accepting a lower-paying, part-time job as an educational aide, or being terminated. Valdez opted to take the educational aide position, and brought suit under the ADA, seeking reinstatement to his position as a CSP supervisor. Like in *Taylor*, the defendant, APS, filed a motion for summary judgment. And the court, as in *Taylor*, denied the motion, concluding that genuine disputed issues of fact persisted as to whether Valdez was capable of performing the essential functions of the "light-duty" CSP supervisor job. Relying almost exclusively on *Taylor*, the court explained that "Valdez' inability to perform the essential functions of his original position [equipment operator] does not defeat his ADA claims." *Valdez*, 875 F.Supp. at 745.

Of course, district court opinions are of little or no authoritative value to us, and the persuasiveness of the reasoning underlying such decisions is at its lowest when, as here, it comes from courts that are not bound by the precedents of this circuit. Notwithstanding, *Taylor* and *Valdez* are different from the present appeal in one very significant way—the plaintiffs in those cases were assigned to *permanent* "light-duty" assignments, whereas Malabarba's "light-duty" work assignment as a material handler was only temporary.[11] Temporary "light-duty" jobs at the Tribune typically last no longer than three months. Malabarba was a material handler for little more than one month, if that. Although the ADA provides that reassignment to a vacant position may constitute a reasonable accommodation, it does not require that employers convert temporary "light-duty" jobs into permanent ones. *See Dalton v. Subaru–Isuzu Automotive, Inc.*, 141 F.3d 667, 680 (7th Cir.1998) (The ADA's language has been interpreted as not requiring that employers "create new full-time positions to accommodate its disabled employees . . . .") (citing *McCreary v. Lib-*

---

**10.** The facts as set forth in the *Taylor* opinion fail to delineate the nature of the "false claims" Taylor filed.

**11.** Because Malabarba failed to adequately deny the allegation, the district court reasoned that he

admitted that the Tribune did not maintain any permanent "light-duty" positions in the packaging department. Our review of the parties' 12(M) and 12(N) statements leads us to the same conclusion.

*bey–Owens–Ford Co.*, 132 F.3d 1159, 1165 (7th Cir.1997)). When Malabarba was released from the packaging department, he was working on temporary "light-duty" assignments as a packager, not driving a forklift as a permanent material handler. In fact, during his limited duration as a material handler, Malabarba continued to be classified as a packager. The relevant question before us is whether he had the ability to perform the essential functions of a packager, with or without accommodation. Malabarba admits that his physical impairments and medical restrictions precluded him from doing so, and nothing contained within the record disputes the fact that Malabarba is not a "qualified individual" to work as a packager under the ADA. As a result, the trial judge's entry of summary judgment in the Tribune's favor was proper.

■ Even if we assumed, *arguendo*, that Malabarba's qualifications were more properly measured against the essential functions of a material handler, he still would not be a "qualified individual" as the ADA defines that term. Indeed, a material handler's duties are not limited to only driving a forklift. As the job description makes clear, he or she is also "[r]esponsible for the disposal of set-asides, wooden pallets and binders in a timely manner and manually stacking material in preparation for disposal." It "[r]equires physical dexterity to lift and move material" without the aid of machinery. One of Malabarba's co-workers at TPW, Beatrice Posey, went so far as to say that the material handler position is as physically demanding as the packaging job. The following colloquy took place at her deposition:

Q. Would you consider the packager position to be more physically demanding than that of an inventory quality clerk [a material handler]?

A. I wouldn't.

Q. No?

A. No.

\* \* \* \* \* \*

Q. But as an inventory quality clerk [material handler], you're not lifting the amount of weight that you would have to lift as a packager, correct?

A. At certain parts of the week we might have 10 or 15 partial skids ... that need to be shrink-wrapped and sent back to our facility at the Freedom Center. During that time I am bending just as much as anyone on the [inserting] machine is.

Q. And that's, you said, towards the end of the week. So let's say in a given eight-hour shift towards the end of the week, how much of your day are you devoting to going ahead and shrink packaging those partial skids?

A. It depends on how much the shift before me finished and how much they left me. It can take—it may take a whole day, you know.

Malabarba cites to nothing in the record that disputes the fact that the material handler position is one that entails activities which are unquestionably off-limits to him (i.e., bending and lifting). Even the one task Malabarba claims he was able to perform as a material handler, that is, driving a jeep, admittedly caused him back pain.[12] In short, Malabarba's medical restrictions rendered him unqualified to carry out the essential functions of the material handler position, with or without reasonable accommodation.[13] We conclude that Malabarba is, therefore, not a "qualified individual" to work as a material handler, and is precluded from succeeding on his claim that the Tribune violated the ADA by discharging him from his employment.

12. The district court found it undisputed that Malabarba complained to Letizia that vibrations from the fork-lift hurt his back.

13. Malabarba does make the point that the Tribune could have reasonably accommodated him by giving him the one day off every week on which material handlers were required to engage in physically laborious work. Because he failed to raise this issue in the trial court, it is waived

on appeal. *See Chromalloy American Corp.*, 877 F.2d at 603–04 ("[A] party opposing a summary judgment motion must inform the trial court of the reasons, factual or legal, why summary judgment should not be entered. If it does not do so, and loses the motion, it cannot raise such issues on appeal.") (citation and internal quotations omitted).

B. *Reassignment as an Alternative "Reasonable Accommodation"*

■ We now turn to Malabarba's argument that, instead of reassigning him as a CSR II, the Tribune should have, and in fact was obligated by the ADA to have, placed him in another position for which he was qualified and could perform. It is true that "the ADA may require an employer to reassign a disabled employee to a different position as reasonable accommodation where the employee can no longer perform the essential functions of their current position." *Gile v. United Airlines, Inc.*, 95 F.3d 492, 498 (7th Cir.1996). This rule is not without "significant limitations," however. *Id.* at 499. "An employer is not obligated to provide an employee the accommodation he requests or prefers, the employer need only provide some reasonable accommodation." *Id.* (citing *Schmidt v. Methodist Hospital*, 89 F.3d 342, 344–45 (7th Cir.1996)).

> The ADA may only require an employer to reassign a disabled employee to a position for which the employee is otherwise qualified. An employer may be obligated to reassign a disabled employee, but only to vacant positions; an employer is not required to "bump" other employees to create a vacancy so as to be able to reassign the disabled employee. Nor is an employer obligated to create a "new" position for the disabled employee. Furthermore, in order for an employer to be obligated to accommodate an employee by reassigning them to a different position, that accommodation must not impose an "undue hardship" on the employer.

*Id.* (citations omitted). To this we add that an employer does not have to accommodate a disabled employee by promoting him or her to a higher level position. *See Shiring v. Runyon*, 90 F.3d 827, 832 (3rd Cir.1996) (explaining that, for an employee to demonstrate that a reasonable accommodation was available, he would have to establish that "there were vacant, funded positions whose essential duties he was capable of performing, with or without reasonable accommodation, *and that these positions were at an equivalent level* or position" as the job the employee previously held) (emphasis added).

■ We, like the district judge, are convinced from our review of the record that the Tribune Company clearly fulfilled its obligation under *Gile* and the ADA to reasonably accommodate Malabarba's disability by committing significant time and effort to finding him a job as a CSR II. On February 1, 1995, after informing Malabarba that he was being removed from his duties in the packaging department, the Tribune embarked on what we would deem a conscientious and thorough intra-company search to find him a position that he was qualified to perform and was of interest to him. In our view, the Tribune was justified to believe that the CSR II position fell within this category. After all, Malabarba was reliable, possessed sound "people skills," and had a good understanding of the Tribune's operations. Malabarba accepted the Tribune's offer of employment as a CSR II and, as far as the record reflects, did not express any apprehensions about his ability to meet the demands of the job at the time.[14] His only concerns dealt with the pay he was to receive and the hours he would have to work. The Tribune handled the situation by providing Malabarba with worker's compensation benefits to make up most of the difference between his former salary as a packager and his new salary as a CSR II. Malabarba willingly undertook the four-week training program that the Tribune requires all of its CSRs to successfully complete. For some reason, whether due to lack of ability or interest, Malabarba did not grasp the course materials and failed the one-on-one and written portions of the final examination, as well as the classroom environment training. Unable to identify any other available positions for which Malabarba was qualified, the Tribune terminated his employment. Malabarba now claims that his placement in the CSR II position was not a "reasonable accommodation" because he did

---

14. The résumé Malabarba submitted to the Tribune indicated that he possessed typing skills, and he aired his doubts about whether he could type well enough to pass the CSR II training course only *after* he was in the program for a period of time. The course trainer even suggested to Malabarba that he come to class early, and stay late, in order to improve his typing speed and accuracy. The record reflects that he did so, at most, six times during the four-week course.

not possess the requisite typing and computer skills. We disagree. Even if this were true, it is nevertheless irrelevant, as Malabarba's failure to pass the CSR training program arose out of his lack of comprehension of the course materials, not his poor typing or computer skills.[15]

■ Malabarba claims that there were jobs other than the CSR II position to which the Tribune could have assigned him, jobs that were within his physical limitations. His proposed alternatives include working as a control room operator, a material handler driving a fork-lift, or a packager on an inserting machine with an automatic lift. In our view, these suggested accommodations are unreasonable; each one would have saddled the Tribune with a duty that is not compelled by the ADA. As for the control room operator position, Malabarba readily admits that the job "has a higher grade position than a packager."[16] But, as noted above, an employer is not obligated to accommodate a disabled employee by promoting him or her to a higher level position. *See Shiring,* 90 F.3d at 832. While Congress enacted the ADA to establish a "level playing field" for our nation's disabled workers, *see Schmidt,* 89 F.3d at 344, it did not do so in the name of discriminating against persons free from disability. Restated, the ADA does not mandate a policy of "affirmative action in favor of individuals with disabilities, in the sense of requiring that disabled person be given priority in hiring or reassignment over those who are not disabled." *Daugherty v. City of El Paso,* 56 F.3d 695, 700 (5th Cir.1995). Malabarba seeks just such preferential treatment to which the ADA does not entitle him. Malabarba's argument with respect to the material handler position runs into a similar roadblock. We have already held that his physical limitations and, in turn, his medical restrictions, precluded him from performing all the essential functions of that job, with or

without reasonable accommodation, and we need not retrace our steps here.

■ Lastly, we think it evident that it would be unreasonable for Malabarba to have expected the Tribune to separate the automatic lift operator task out of the multi-duty inserting packager position. As we explained in *Miller v. Illinois Dep't of Corrections,* 107 F.3d 483, 485 (7th Cir.1997) (emphasis in original), "if an employer has a legitimate reason for specifying multiple duties for a particular job classification, duties the occupant of the position is expected to rotate through, a disabled employee will not be qualified for the position unless he can perform enough of these duties to enable a judgment that he can perform its *essential* duties." We repeat, as it is worth repeating—Malabarba concedes that he is unable perform all the essential tasks of a packager working on the inserting machine support team (i.e., bending, lifting heavy objects, and standing for long periods of time). The question thus becomes whether the Tribune's rationale for rotating employees among the various duties attendant to the inserting machine is a legitimate one. We are convinced it is. Letizia explained at his deposition that, with respect to Tribune employees in the packaging department, "we try to have them trained on every aspect of the [packager] job because you never know when one person is not going to be there. So you always want to have—you want your core team of Tribune employees trained in every area so anyone can work on any given assignment." The Tribune's packaging department is undoubtedly a demanding and challenging work environment—newspapers must be printed, bundled and shipped off to distribution points in a very short span of time. If one packager is absent, and only Malabarba is available to fill in as a replacement, yet he is physically incapable of doing so, the timing of the Trib-

---

**15.** As the following exchange at Malabarba's deposition demonstrates, he acknowledges that his lack of typing ability had nothing to do with his failure of the CSR training course.

Q. Now, the standards which you were found to have failed involved the one-on-one portion of the final exam, the written portion of the final exam and the classroom environment training, right?

A. Right.

Q. None of those things had anything to do with typing speed, did they?

A. Correct.

**16.** It is disputed as to whether a position was even available in the control room.

une's all-important delivery system breaks down. Its readers may very well find their morning paper at the front stoop when they arrive home in the evening, rather than upon awakening at daybreak. The Tribune, like all of the print media, most definitely has a legitimate interest in strictly adhering to its production and distribution schedules and, in turn, keeping its customers as well as its advertisers satisfied. As a consequence, the accommodation that Malabarba proposes as being "reasonable"—splitting up the duties of the multi-task packager position-is inconsistent with what our case law requires of employers under the ADA.

## IV. CONCLUSION

We hold that Malabarba is not a "qualified individual with a disability" within the meaning of the ADA, that the Tribune afforded him reasonable accommodations, and that the trial judge's entry of summary judgment in the Tribune's favor was appropriate. Simply stated, Malabarba is requesting that the Tribune undertake action that the ADA does not require it to do, like creating a new position for him. The judgment of the district court is, therefore, affirmed.

AFFIRMED.