In the

# United States Court of Appeals

## For the Seventh Circuit

---

No. 16-1971

SHERLYN BROWN,

*Plaintiff-Appellant,*

*v.*

MILWAUKEE BOARD OF SCHOOL DIRECTORS,

*Defendant-Appellee.*

---

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 13-C-747 — **Rudolph T. Randa**, *Judge.*

---

ARGUED NOVEMBER 3, 2016 — DECIDED MAY 4, 2017

---

Before BAUER, MANION, and HAMILTON, *Circuit Judges.*

HAMILTON, *Circuit Judge.* This appeal under the Americans with Disabilities Act addresses a disabled employee's obligation to participate in identifying reasonable accommodations for her condition.

Plaintiff Sherlyn Brown was an assistant principal for defendant Milwaukee Public Schools until she badly injured her knee while restraining a student. When she returned to work

following surgery, she and her doctor told Milwaukee Schools that she could not be "in the vicinity of potentially unruly students." Since virtually all students are "potentially" unruly, Milwaukee Schools understood that limit to bar virtually all contact with students. It repeatedly communicated that understanding to Brown as it tried to accommodate her disability by finding her a new position. When Brown's three-year leave of absence expired before a suitable position was found, Milwaukee Schools fired her. Brown sued under the Americans with Disabilities Act, claiming that her disability had never prevented interaction with students and that Milwaukee Schools failed to accommodate her disability. The district court granted summary judgment for Milwaukee Schools, and Brown has appealed.

We affirm. Because Brown and her doctors repeatedly told Milwaukee Schools that she could not be "in the vicinity of potentially unruly students," Milwaukee Schools is not liable for failing to move her to a position requiring such proximity. All but one of the other jobs Brown identifies as reasonable accommodations would have required such proximity. The lone exception would have been a promotion for which Brown was not the most qualified candidate. The Act did not require Milwaukee Schools to promote her as an accommodation.

I. *Legal Framework*

We review *de novo* a district court's grant of summary judgment. Our account of the facts views the evidence in the light most favorable to the non-moving party, but we must affirm if no reasonable trier of fact could find in favor of the non-moving party. *White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir. 2016).

Our account of the facts will be easier to follow with a brief outline of the reasonable accommodation duty under the Americans with Disabilities Act. The Act requires employers to make "reasonable accommodations that will allow a 'qualified individual with a disability' to perform the essential functions of his or her job." *Miller v. Illinois Dep't of Transportation*, 643 F.3d 190, 197 (7th Cir. 2011), quoting 42 U.S.C. § 12112(b)(5)(A). "Reassigning disabled employees to vacant positions that they can perform is a reasonable accommodation." *Emerson v. Northern States Power Co.*, 256 F.3d 506, 515 (7th Cir. 2001), citing *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 693 (7th Cir. 1998); 42 U.S.C. § 12111(9) (reasonable accommodation "may include … reassignment to a vacant position").

A disabled employee need not be the most qualified applicant for a vacant position, but she must be qualified for it. *EEOC v. United Airlines, Inc.*, 693 F.3d 760, 764 (7th Cir. 2012) (holding that deviation from a best-qualified selection policy does not always represent an undue hardship for the employer); *Jackson v. City of Chicago*, 414 F.3d 806, 813 (7th Cir. 2005) ("The employer need only transfer the employee to a position for which the employee is otherwise qualified."), quoting *Rehling v. City of Chicago*, 207 F.3d 1009, 1014 (7th Cir. 2000). The Act does not, however, require employers to promote employees to accommodate them. *Malabarba v. Chicago Tribune Co.*, 149 F.3d 690, 699 (7th Cir. 1998), citing *Shiring v. Runyon*, 90 F.3d 827, 832 (3d Cir. 1996).

Identifying reasonable accommodations for a disabled employee requires both employer and employee to engage in a flexible, interactive process. See *Stern v. St. Anthony's Health*

*Center*, 788 F.3d 276, 292 (7th Cir. 2015), citing *Kauffman v. Petersen Health Care VII, LLC*, 769 F.3d 958, 963 (7th Cir. 2014). Both parties are responsible for that process. If a reasonable accommodation was available but the employer prevented its identification by failing to engage in the interactive process, that failure is actionable. *Id*. On the other hand, if the employee "does not provide sufficient information to the employer to determine the necessary accommodations, the employer cannot be held liable for failing to accommodate the disabled employee." *Reeves ex rel. Reeves v. Jewel Food Stores, Inc.*, 759 F.3d 698, 702 (7th Cir. 2014), citing *Beck v. University of Wisconsin Board of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996).

II. *Factual and Procedural Background*

In light of these principles, the critical facts here concern (1) the communications between Brown and Milwaukee Schools about the extent of her restrictions, especially her ability to be in the vicinity of potentially unruly students; and (2) the potential reassignments she discussed with Milwaukee Schools as accommodations for her disability.

A. *Brown's Injuries*

In 2006, Brown was an assistant principal for Milwaukee Schools. She began to experience severe knee pain while performing the duties of that position. Her doctor diagnosed her with severe arthritis and recommended that she be moved to a job with limited mobility requirements. For the next few years, Milwaukee Schools accommodated her by changing the location of her work and modifying her job duties. It excused her from breaking up fights and physically intervening with students, which would normally be an assistant principal's responsibility. She arranged those accommodations with

James Gorton, Milwaukee School's employment specialist who continued to work on her case for the remainder of her employment. During that time, Brown underwent knee replacement surgery.

Despite these precautions, Brown injured her knee again in 2009, not long after her surgery, while restraining an unruly student. She had another surgery. Her doctor then restricted her to sedentary work with no student interaction until further notice. A few months after her return to work, in May 2010, her doctor clarified that incidental or one-on-one contact with students "should not be a problem," but that contact with out-of-control children or potentially combative students should be avoided.

B. *Brown's Leave of Absence*

In late July 2010, Brown clarified her medical restriction again. She had been assigned to a new school building as an assistant principal. She found that she was expected to "patrol the halls, [and] be involved in student contact." She called Gorton and told him that she still needed to "avoid interaction with volatile students." Gorton said he thought her doctor had changed that limit, and he asked her to have her doctor confirm that she had that restriction. Two days later, her doctor told Gorton that Brown "should not be in the vicinity of potentially unruly students." That restriction, he said, was "permanent"—it would not be removed for at least three to four years, if ever. Gorton immediately told Brown that she could not continue working as an assistant principal and that she would be on sick pay while he worked with her to find a new position. He discussed the scope of the search for a replacement position with her. She said she was interested in

positions at or above her pay grade, salary, and number of working days, and would prefer to remain in her union.

A week later, Gorton sent Brown a list of eight vacant positions he had considered, including a Student Achievement Supervisor position, but he explained that he did not believe any was suitable. For six of the positions, he listed "the job duties require being in the vicinity of potentially unruly students" among the reasons they were unsuitable. For four of the positions, that was the only listed reason. The Student Achievement Supervisor position was unsuitable solely because it required being in the vicinity of potentially unruly students. Brown did not dispute Gorton's characterization of her restriction.

Later that week, Brown expressed interest in two other positions, including a Charter School Program Officer position. Gorton told her she was not physically qualified for those positions because she would "need to be in the schools to interact with students and staff." Again, Brown did not dispute his characterization of her restriction.

The next month, Gorton received a letter from an attorney for Brown's union. That letter did dispute his understanding of her restrictions, saying that she was able to "interact[] with students and staff" but not able to "serve in a position of authority … over potentially unruly students." Gorton wrote back disagreeing with the attorney's characterization and offering to show the attorney the doctor's specific restrictions. No one followed up with him, and the conversation ended there.

Brown had another surgery in late 2010 and was cleared to return to work in early 2011 with restrictions, including a

doctor's instruction to "avoid/no student discipline situations." Gorton asked again for clarification and emailed Brown a questionnaire for her doctor to complete. He also asked her to review the factual background provided in the questionnaire, and to let him know if she saw inaccuracies. That background section quoted the doctor's earlier statement that "Ms. Brown *should not be in the vicinity of potentially unruly students*." (Emphasis in original.) It asked the doctor if he was lifting that restriction and what he meant by "avoid student discipline situations." It added parenthetically that "Ms. Brown does not believe that she should be in the vicinity of unruly students."

Brown evidently did not receive that email; two weeks later, she emailed Gorton to ask why she had not heard from him to arrange her return to work. He re-sent the email and asked her to confirm receipt. He then did not hear from Brown for three weeks, during which he left two voicemails, sent a certified letter, and finally sent an email indicating he would deactivate his file if she did not reply. Brown eventually did reply, and her doctor sent him a response to the questionnaire. The doctor said that the July 2010 restriction, which forbade Brown being "in the vicinity of potentially unruly students," remained in place. He added that "she should not be put in a position" to injure her knee "in attempting to subdue an unruly student."

Brown later applied for two positions with Milwaukee Schools: a GE Grant Administrator Position and a Title I Coordinator position. She was not selected for either position. She met with Gorton about the reassignment process on October 14, 2011. Each of them later summarized the meeting in an email to the other. According to Gorton, Brown asked why

she still had not been given a position, and Gorton told her that her work restrictions left very few positions with Milwaukee Schools available to her: "most jobs in the district require interaction with students who may be unruly." Brown's account is similar. According to her, Gorton told her that "every job in the district required individuals to work with students, except highly specific positions," and that she "could not be around potentially unruly students." Brown did not disagree with that characterization of her restriction.

Around the same time, Brown was evaluated by a physician in connection with her disability benefits. That doctor also imposed "permanent work restrictions," including instructions to "avoid circumstances where unruly behavior may occur. Avoid contact with unruly individuals and situations where potentially unruly behavior may occur." One month later, in November 2011, Brown asked Gorton about a Student Achievement Supervisor position, which he explained involved "working in the presence of potentially unruly students." A similar conversation occurred in early 2012: Brown called Gorton to ask about a Student Services Coordinator position, and he said she was not physically qualified for the position.

C. *Brown's Termination*

About two and a half years later, Milwaukee Schools sent Brown a letter warning her that she had nearly exhausted the three years of leave of absence to which she was entitled. Brown's doctor then called Gorton to ask for a list of the essential functions of the Assistant Principal position. Gorton replied with a list, adding that the job included "working in the vicinity of potentially unruly students" and asking for an update on Brown's work restrictions. Brown's doctor replied

that Brown could return to work with restrictions. He explained that Brown "should not be put in a position where she is responsible for monitoring and controlling students that may become uncontrollable." The doctor added: "I see no reason why she could not be around students; she just must not be responsible for controlling those students and it would seem that Security should be available to handle such things."

After receiving that evaluation, Milwaukee Schools searched its available positions and identified four vacant lateral positions, including a Charter School Program Officer and a Student Services Coordinator position. It concluded that Brown was not medically qualified to perform either of those positions because they would involve being around potentially unruly students and potentially monitoring or controlling those students. Because Milwaukee Schools concluded that Brown could not perform the essential functions of any available position, it terminated her employment.

Brown filed suit in the Eastern District of Wisconsin. Following amendments, her complaint claimed that Milwaukee Schools had violated the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, by failing to accommodate her disability and then terminating her. After conducting discovery, both parties moved for summary judgment. The district court granted Milwaukee Schools' motion and denied Brown's.

III. *Analysis*

Brown contends on appeal that Milwaukee Schools should have accommodated her disability by reinstating her as Assistant Principal or by reassigning her to any one of five vacant positions: Student Achievement Supervisor, Student Services

Coordinator, Charter School Program Officer, GE Grant Administrator, and Title I Coordinator. Milwaukee Schools argues that because Brown could not be in the vicinity of potentially unruly students, she was not qualified to perform the essential functions of either her Assistant Principal position or the first four vacant positions. It argues that the final vacant position would have been a promotion for which she was not the most qualified candidate.

The undisputed facts show that Brown told Milwaukee Schools that she could not work in the presence of students. They also show that all but one of the identified vacant positions required work in the presence of students. Brown therefore did not give Milwaukee Schools the information it needed to accommodate her in those positions, and it is not liable for not assigning her to them. As for the last possible position, we agree with Milwaukee Schools that it would have been a promotion it was not required to offer Brown.

A. *Qualified to Perform Essential Functions*

Milwaukee Schools believes that, with or without reasonable accommodation, Brown was not qualified for either the Assistant Principal position or four of the alternative vacant positions because those positions required her to be in the vicinity of potentially unruly children, which she was unable to do. Brown disagrees, arguing that she was able to be near potentially unruly students, and that, in any case, none of the positions required such contact.

1. *Brown's Restrictions*

As noted above, identifying reasonable accommodations for a disabled employee requires both employer and employee to engage in a flexible, interactive process. See *Stern*,

788 F.3d at 292. The key principle for purposes of this case is that if the employee "does not provide sufficient information to the employer to determine the necessary accommodations, the employer cannot be held liable for failing to accommodate the disabled employee." *Reeves*, 759 F.3d at 702.

Such a situation occurred in *Steffes v. Stepan Co.*, 144 F.3d 1070 (7th Cir. 1998). The plaintiff in that case had a condition that restricted her breathing. It was dangerous for her to be exposed to certain chemicals, which limited the jobs she could perform at the chemical company where she worked. She initially gave her employer a doctor's note ordering that she not be exposed to chemicals, a restriction "the company took … seriously." *Id.* at 1072. "Given the blanket nature" of that restriction, "the obligation fell" to the plaintiff "to update or further clarify the kinds of work she could do." *Id.* She did not do so.

When the company offered Steffes a reassignment conditioned on her doctor's approval, her doctor's reply "failed to address the exposure issues" the company asked about, and "displayed a poor understanding" of the company's operations. *Id.* at 1072–73. The company explained that to the plaintiff and did not offer her the reassignment, but asked her to update it if her condition changed. The plaintiff "did not provide any further information to the company," and thereby "failed to hold up her end of the interactive process." *Id.* at 1073.

Brown's case parallels *Steffes*. She repeatedly presented Milwaukee Schools with a broad restriction for a school system: she needed to avoid proximity to potentially unruly students. Essentially all students are *potentially* unruly. Milwaukee Schools was always clear about its understanding of her

restrictions, and Brown never challenged that understanding. Gorton repeatedly told Brown that she could not perform positions that required being "in the vicinity of potentially unruly students." He said that she was not qualified for a position because she would "need to be in the schools to interact with students and staff." In Brown's retelling of one meeting, Gorton told her (not surprisingly, we must add) that almost "every job in the district required individuals to work with students." Nowhere in the record did Brown tell him he had misunderstood her abilities and limitations.[1]

She points out that on four occasions, other people acting on her behalf challenged Milwaukee School's understanding. On three of those occasions, however, the undisputed facts show that Milwaukee Schools sought clarification and either did not receive any or was again told that she could not be near students. On the fourth and final occasion, Milwaukee

---

[1] Two points in the record, both in Brown's deposition, ambiguously suggest such a correction, but neither would justify denying summary judgment. In the first, Brown described her 2012 conversation with Gorton about the Student Services Coordinator position. She said that he told her she was not physically qualified and that "there was a disagreement … in the conversation … I told him that I would not be controlling the students." Later in the deposition, discussing a different position, Brown said that she agreed "at that particular time" that the job duties required being in the vicinity of potentially unruly students, but that that "has changed to the degree that I had to explain to him at a later date that not knowing how he was coming up with it and the information that he was getting in terms of me not being qualified because of my medical condition, it did not change, but my interpretation of what he was telling me changed. And I began—and I challenged him after that in terms of the positions that he offered me." It is unclear from those comments what she communicated to Gorton, and neither comment addressed Brown's medical restrictions, focusing instead on the duties of particular positions.

Schools appropriately interpreted the comment in the context of earlier exchanges.

The first instance began in May 2010. In that month, Brown's doctor modified her work restrictions, which had previously prohibited student interaction, to allow incidental contact between Brown and students. But when Milwaukee Schools assigned Brown to a school where, in her words, she was expected to "patrol the halls, [and] be involved in student contact," she immediately called Gorton and told him that her restriction had not changed: she still needed to "avoid interaction with volatile students." Two days later, her doctor confirmed that, sending Milwaukee Schools a much more restrictive letter. The letter said Brown was permanently unable to be "in the vicinity of potentially unruly students." It enclosed the doctor's recent examination notes, which said Brown needed to be in a position "that doesn't require her to deal with children with lots of movement."

On the second occasion, Brown's union's attorney sent Gorton a letter explaining that Brown was able to "interact[] with students and staff" and that Gorton's contrary belief was "at best, in error." If that were correct, that would be important, of course. Gorton wrote back, disagreeing and offering to show the attorney the doctor's letter with its greater restrictions. There is no evidence that the union attorney or anyone else followed up with Gorton.

The third occasion was Brown's 2011 return to work following a surgery. Her work restrictions did not include the earlier broad ban on working "in the vicinity of potentially unruly students," but instead instructed her to avoid "student discipline situations." Gorton asked for clarification, quoting

the earlier restriction and asking whether the doctor was lifting it. The doctor replied that the earlier restriction "remains in place."

The fourth and final occasion was in August 2014, four days before Brown's leave of absence expired. Brown's doctor sent Gorton a fitness-for-duty certificate. The attached patient examination notes said that there was "no reason why she could not be around students; she just must not be responsible for controlling those students." They said that she, "as before, should not be put in a position where she is responsible for monitoring and controlling students." The notes did not claim to change Brown's restrictions. Some of the language is broad and ambiguous, referring to situations "where there could be some question" of controlling a student and noting that security should be available to control students.

By then, Milwaukee Schools had believed for four years that Brown could not be near "potentially unruly" students. It had been told that restriction was permanent. The 2014 doctor's note did not say Milwaukee Schools had been wrong, and it did not say the situation had changed. Milwaukee Schools had twice before been given doctor's notes that appeared to loosen the restrictions on Brown, only to be told later that the strict restriction remained in place. Given that history, we do not believe a reasonable jury could find that the last-minute and ambiguous doctor's note, which did not address that history, adequately informed Milwaukee Schools that Brown's limitations were no longer as restrictive.

The undisputed facts show that Milwaukee Schools acted consistently with the restrictions imposed by Brown's doctors, which said that Brown simply could not work in the vicinity of potentially unruly students. To the extent Brown is arguing

that her restrictions were less severe than Milwaukee Schools believed, the undisputed facts show that Brown "failed to hold up her end of the interactive process by clarifying the extent of her medical restrictions." *Steffes*, 144 F.3d at 1073. Milwaukee Schools accordingly cannot be held liable for failing to put her in a position it believed would exceed those restrictions.

### 2. *Essential Functions*

Brown argues that being in the vicinity of potentially unruly students was not an essential function of any of the positions she requested, for two reasons. First, she asserts, citing 29 C.F.R. § 1630.2(o)(1)(ii), that being in such proximity is a description of work environment, not a description of a job function. Second, she argues that such proximity is not an essential function according to any of the factors courts usually consider: it is not listed on any job descriptions, for example, nor do any of the positions exist to perform it. See *Dunderdale v. United Airlines, Inc.*, 807 F.3d 849, 853–54 (7th Cir. 2015) (courts should examine several factors to determine essential functions, including the employer's judgment and the written job description), citing 42 U.S.C. § 12111(8) and 29 C.F.R. § 1630.2(n)(1)-(3).

Brown's rigid distinction between work environment and job functions is not realistic. Some job functions can be performed without regard to some aspects of work environment. In many office environments, for example, it may be possible to change the temperature, lighting, or desk arrangements to accommodate someone's needs. But sometimes a job function requires a specific work environment. Lawn maintenance cannot be performed indoors; a jockey must often work atop a horse; receptionists must be near office visitors. Section

1630.2(o)(1)(ii) does not say otherwise. It simply lists changes
to work environment as one possible way of accommodating
a disabled employee. Neither Brown's evidence nor her argu-
ments suggest that the positions she wanted could have been
modified to avoid student contact.

Brown's second argument is similarly artificial. She fo-
cuses on a narrow framing of her restriction, ignoring the log-
ical consequences of that restriction. If Brown could not be
near students, then she could not meet with students, could
not walk down school hallways during the school day, could
not sit in on classes, etc. Milwaukee Schools argues this means
she could not perform: (1) the Assistant Principal position, be-
cause it would require her to be in schools overseeing their
day-to-day operations; (2) the GE Grant Administrator posi-
tion, because it would require her to attend and lead meetings
at which students were present and in schools in which stu-
dents were present; (3) the Student Achievement Supervisor
position, because it would require her to conduct classroom
observations and work daily in schools; (4) the Charter School
Program Officer, because it would require in-school compli-
ance checks and classroom observations; and (5) the Student
Services Coordinator position, because it would require in-
school meetings with students with serious disciplinary prob-
lems. To support these points, Milwaukee Schools relies on
job descriptions, affidavits from human resources employees,
and Brown's deposition testimony. Brown offers nothing to
contradict these points, so we must agree with Milwaukee
Schools. See *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487,
490 (7th Cir. 2007), *overruled on other grounds by Ortiz v. Werner
Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016) (non-moving

party must identify "with reasonable particularity the evidence upon which the party relies"), citing *Johnson v. Cambridge Industries, Inc.*, 325 F.3d 892, 898 (7th Cir. 2003).

B. *Promotion*

Our discussion so far has eliminated from consideration four of the five positions Brown requested. The remaining position, the Title I Coordinator position, did not require proximity to students. Milwaukee Schools contends that it was a promotion and that Brown was not the most qualified candidate, and therefore it was not obligated to give her the position. See *Malabarba*, 149 F.3d at 699 ("[A]n employer does not have to accommodate a disabled employee by promoting him or her to a higher level position."). Brown does not contend that she was the most qualified candidate but instead argues that the position would not have been a promotion.

Milwaukee Schools advances three reasons that the Title I Coordinator position would have been a promotion: (1) Brown's pay grade would increase; (2) her salary would increase because of the pay grade change and because she would be working twelve months per year rather than ten; and (3) the position involved substantially increased responsibilities. Brown disagrees because she did not consider the position a promotion when she applied because the position's salary range included her salary as an assistant principal and because Milwaukee Schools had previously moved her between pay grades without classifying the change as a promotion.

Even accepting these factual assertions, as we must on summary judgment, they do not present a genuine issue of material fact. Whether a reassignment would be a promotion,

demotion, or lateral transfer is not determined by the employee's perceptions. See *Gile v. United Airlines, Inc.*, 95 F.3d 492, 497 (7th Cir. 1996) ("Employers should reassign the individual to an equivalent position, in terms of pay, status, etc."), quoting 29 C.F.R. app. § 1630.2(o). And while Milwaukee Schools once moved Brown between pay grades without classifying the change as a promotion, her salary remained the same despite the change in grade. Brown does not explain why that happened, nor does she point to evidence that Milwaukee Schools could do that again. Most important, Brown does not dispute that her salary would have increased by about $20,000 per year if she had taken the Title I Coordinator position. Cf. *Office of the Architect of the Capitol v. Office of Compliance*, 361 F.3d 633, 640–41 (Fed. Cir. 2004) (finding substantial evidence that moving an employee into a position normally accorded a higher wage grade classification was not a promotion: the employer "frequently move[d] employees between positions without changing their pay or wage grade classification"). Brown does not deny that the Coordinator position involved twelve months of work rather than the Assistant Principal's ten. Cf. *Emerson*, 256 F.3d at 515 ("NSP did not simply transfer Emerson into the available full-time position because it would have been a promotion from part-time status to full-time status."). Nor does she deny that the position involved increased responsibilities. A reasonable jury would be, and we are, forced to conclude that the Coordinator position would have been a promotion that the Americans with Disabilities Act did not require be offered to Brown.

This is an unusual case, and our holding is correspondingly narrow. If Milwaukee Schools, rather than Brown's doctor, had decided that she could not be near students, we would have a different case. So too if Milwaukee Schools had

not communicated its understanding of Brown's restrictions to her or if it had not sought clarification when it received contradictory information. See *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 808 (7th Cir. 2005) (reversing summary judgment where employer "did not actively engage in the interactive process by suggesting possible accommodations or requesting information that would help it do so"); *Bultemeyer v. Fort Wayne Community Schools*, 100 F.3d 1281, 1285 (7th Cir. 1996) (reversing summary judgment where employer could have called to clarify potentially ambiguous doctor's note but did not). But the undisputed facts show here Milwaukee Schools acted on the basis of restrictions imposed by Brown's doctors and that no reasonable accommodation of her disability was possible. The judgment of the district court is AFFIRMED.