In the

# United States Court of Appeals

### For the Seventh Circuit

———————

No. 18-3508

JAMES GRAHAM, JR.,

*Plaintiff-Appellant*,

*v.*

ARCTIC ZONE ICEPLEX, LLC,

*Defendant-Appellee*.

———————

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:17-cv-01742 — **William T. Lawrence**, *Judge*.

———————

ARGUED APRIL 9, 2019 — DECIDED JULY 23, 2019

———————

Before KANNE, BARRETT, and BRENNAN, *Circuit Judges*.

BARRETT, *Circuit Judge*. James Graham, Jr., sued Arctic
Zone Iceplex, his former employer, for discrimination. According to Graham, Arctic Zone failed to accommodate his
disability and ultimately fired him for it. The district court
granted summary judgment to Arctic Zone. We affirm.

I.

In December 2014, Arctic Zone hired Graham as its head mechanic and maintenance supervisor. Graham's responsibilities included maintaining Arctic Zone's ice rink and operating its Zamboni, a machine that smooths the surface of ice on a rink.

Graham's tenure at Arctic Zone was not without issues. Shortly after he began working at the rink, Arctic Zone received customer complaints about his attitude. And the customers were not the only ones who noticed. Arctic Zone observed Graham's attitude problems firsthand, as well as his difficulty completing tasks on time. Arctic Zone did not write Graham up, however, for either the insubordination or timeliness issues at the time that they occurred.

In February 2015, Graham was injured on the job. He did not work from February to May of that year. During that time, he received worker's compensation. Graham returned to work in May with certain medical restrictions, including the requirement that he work sitting down. In an effort to accommodate him, Arctic Zone assigned Graham to the task of skate sharpening. Arctic Zone asserts that skate sharpening is a job that can be accomplished from a seated position; Graham maintains that the task requires standing. Yet he did not inform Arctic Zone of his belief that skate sharpening did not meet his restrictions. He alleges that there were a few times when he was caught sitting down to rest and was told to get back to work.

Starting in August 2015, Graham transitioned back to full-time work. Arctic Zone assigned him to work evenings rather

than during the day, which it attributes to seasonal need. Graham characterizes this as a "demotion" to the position of "night mechanic."

In October 2015, Graham caused a Zamboni accident. Arctic Zone says that the accident resulted in "over two feet of jagged plastic" protruding from the rink wall and onto the rink itself. Arctic Zone suggests that the plastic was a hazard to its customers.

Arctic Zone fired Graham on the day of the accident. It gave five reasons for doing so in his Termination Notice. They can be summarized as follows: (1) poor attitude about his change in position; (2) poor attitude toward customers (citing customer complaints); (3) lack of timeliness in completing his duties; (4) insubordination with management; and (5) the Zamboni accident, which put customers in danger and caused Arctic Zone to lose revenue while the rink was being repaired.

Graham sued Arctic Zone for discrimination in violation of the Americans with Disabilities Act. *See* 42 U.S.C. § 12101. He alleged two violations: first, that Arctic Zone failed to reasonably accommodate his disability; and second, that it terminated him because of his disability. The district court granted summary judgment to Arctic Zone on both counts. Graham appeals.

## II.

We first address whether Arctic Zone failed to accommodate Graham's disability. "The [ADA] requires employers to make 'reasonable accommodations that will allow a qualified individual with a disability to perform the essential functions of his or her job.'" *Brown v. Milwaukee Bd. of Sch. Dirs.*, 855 F.3d 818, 820 (7th Cir. 2017) (citation omitted). Graham asserts that

Arctic Zone fell short of this standard when it assigned him to skate sharpening, which he says could not be accomplished while sitting down.

But "[i]dentifying reasonable accommodations for a disabled employee requires both employer and employee to engage in a flexible, interactive process." *Id.* at 821. If an employee "does not provide sufficient information to the employer to determine the necessary accommodations, the employer cannot be held liable for failing to accommodate the disabled employee." *Id.* (citations omitted). Graham acknowledges that he did not make Arctic Zone aware of his belief that his skate sharpening assignment didn't comport with his medical restrictions. This is a textbook example of an employee "not provid[ing] sufficient information to the employer to determine the necessary accommodations." *Id.* (citations omitted). Because he failed to uphold his end of the interactive process, we affirm the district court's grant of summary judgment on the accommodation issue.

### III.

We next address whether Arctic Zone violated the ADA when it fired Graham. *See* 42 U.S.C. § 12112(a). While the district court assumed that Graham was disabled for purposes of the statute, it held that Graham had failed to provide sufficient evidence that his disability was the but-for cause of the termination. It granted Arctic Zone summary judgment on that ground, and it was right to do so.

Under *Ortiz v. Werner Enterprises, Inc.*, the ultimate question in a discriminatory employment termination case is "[w]hether a reasonable juror could conclude that [the plain-

tiff] would have kept his job if he [was not disabled], and everything else had remained the same." 834 F.3d 760, 764 (7th Cir. 2016). One way to demonstrate this is by showing that the stated reasons for the firing were pretextual. *See Hitchcock v. Angel Corps, Inc.*, 718 F.3d 733, 737–38 (7th Cir. 2013). In evaluating pretext, "the question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason it has offered to explain the discharge." *Monroe v. Ind. Dep't of Trans.*, 871 F.3d 495, 505 (7th Cir. 2017) (citation omitted). Pretext requires more than just "faulty reasoning or mistaken judgment on the part of the employer; it is [a] lie, specifically a phony reason for some action." *Id.* (alteration in original). Graham argues that the five reasons that Arctic Zone gave in its Termination Notice were pretextual.

To start, Graham asserts that the behavioral problems cited by the notice—his apparent bad attitude, inability to complete work on time, and insubordination—could not be legitimate bases for his termination because he had received no written notice or discipline for them before the Zamboni accident. His premise seems to be that by not addressing the issues earlier, Arctic Zone somehow forfeited its right to count these problems as black marks on his record. Not so. Arctic Zone's decision to let something slide without a formal response does not mean that it went unnoticed or untallied. And even minor grievances can accumulate into a record that justifies termination. A reasonable jury could not conclude that Arctic Zone was lying about the impact of these violations solely because Arctic Zone held its tongue when they occurred.

Graham next tries to show pretext by pointing to the testimony of his supervisor, Floyd Johnson. In a deposition, Johnson testified that Graham's "position" never changed when he began working nights. Graham says that this contradicts the Termination Notice's assertion that Graham was unhappy about his "change of position" when he became the "night mechanic." But Graham's "gotcha" argument relies on an overly technical reading of the word "position." When he began working nights, Graham's schedule changed, and in that sense, his position could be thought to have changed as well. The Termination Notice acknowledges this fact, as well as the fact that Graham apparently saw this change as significant. But according to Johnson, Graham's schedule was the only meaningful change—his compensation and title remained constant. So in another sense, Johnson's assertion that Graham's "position" didn't change was a reasonable conclusion. The minor inconsistency in the usage of this nontechnical term does not support an inference of bad faith.

Graham's last argument addresses the Zamboni incident. He disputes neither his responsibility for causing the accident nor the fact that it caused damage. Instead, he makes two arguments. First, he asserts that Arctic Zone overstated the seriousness of the accident, which ultimately cost only around $150 in repairs. Second, he argues that Arctic Zone treated him differently than another former employee, Geoff Heavner, who had previously caused a similar accident—which caused roughly $1,500 in damage—but was not fired.

In response, Arctic Zone notes that when it fired Graham, it did not yet know how much his accident would end up costing. As to the differences between Graham and Heavner, Arc-

tic Zone points to Heavner's otherwise sterling employee record prior to the accident. It also states that it was particularly concerned because Graham's accident created a hazard for its customers, whereas there is no suggestion that Heavner's accident did so.

Here too, Graham fails to provide enough evidence to support an inference of bad faith. Heavner ultimately caused more damage. But that was his first strike, whereas Graham had several strikes before the Zamboni incident. And the fact that Heavner's accident did not pose a danger to customers seals the deal—the two employees were not "similarly situated" enough for us to infer that the stated reasons for their different treatment were pretextual. *See Lloyd v. Swifty Trans., Inc.*, 552 F.3d 594, 601 (7th Cir. 2009).

\* \* \*

Graham has failed to establish an issue of material fact about whether Arctic Zone discriminated against him by failing to reasonably accommodate him or by terminating him. The district court's judgment is AFFIRMED.