In the

# United States Court of Appeals
## For the Seventh Circuit

---

No. 05-4523

HAL D. HICKS,

*Cross-Claim Plaintiff-Appellant,*

*v.*

MIDWEST TRANSIT, INC., and DONALD
HOAGLAND, as Interim Receiver of
Midwest Transit, Inc.,

*Cross-Claim Defendants-Appellees.*

---

Appeal from the United States District Court
for the Southern District of Illinois.
No. 02 C 4033—**G. Patrick Murphy**, *Chief Judge.*

---

ARGUED NOVEMBER 6, 2006—DECIDED SEPTEMBER 10, 2007

---

Before POSNER, RIPPLE, and SYKES, *Circuit Judges.*

SYKES, *Circuit Judge.* Hal D. Hicks leased 100 mail-carrying trailers to Midwest Transit, Inc. ("Midwest") while he was the president, a director, and a majority shareholder of the company. Shortly thereafter a receiver was appointed by an Illinois state court to protect Midwest from various breaches of fiduciary duties alleged against Hicks in a shareholders' derivative lawsuit. The receiver refused to pay Hicks on the leases, arguing that they were invalid under the Illinois Director Conflict of Interest statute.

While this litigation was ongoing in state court, Hicks's lender filed suit in federal court to foreclose on loans it made to finance Hicks's purchase of the trailers. Hicks cross-claimed against Midwest and the receiver on a variety of contract law theories. Hicks then settled with his lender and the cross-claim litigation was stayed pending the outcome of the state-court litigation. The district court eventually dismissed most of Hicks's claims on summary judgment after concluding he failed to comply with the requirements of the Illinois Director Conflict of Interest statute; the parties settled the claim that survived summary judgment. Hicks now appeals, and we affirm.

## I. Background

This case has a complex procedural history in both state and federal court. When the events that ultimately led to this lawsuit began in early 2000, Hicks was president, one of two directors, and a 50% shareholder of Midwest Transit, Inc., a closely held company with its principal place of business in Illinois. Midwest is in the business of providing mail-carrying trailers to the U.S. Postal Service. Two other individuals, C. Michael Witters and Diane Witters, were each 25% stockholders of Midwest; Diane was also the other director. In January 2000 the Witters initiated a shareholders' derivative lawsuit in Illinois state court to have Hicks removed from office based on a host of financial misconduct allegations, including personally purchasing and then leasing postal-specification trailers to Midwest at inflated rates since 1993. On April 20, 2000, the state court entered a temporary restraining order prohibiting Midwest from transferring any money to Hicks other than amounts due on existing trailer leases.

Shortly thereafter, on May 31 and July 3, 2000, Hicks secured two loans from General Electric Capital Business Asset Funding Corporation ("GE Capital"), a Delaware corporation with its principal place of business in Washington, to purchase 100 more postal-specification trailers. Hicks granted GE Capital a security interest in the trailers, and Midwest guaranteed the loans in agreements signed by its secretary, who was neither a director nor a shareholder. The total amount of the loans was $2,144,600, which broke down to payments of $677 per trailer per month. For reasons uncertain, the trailers were titled in Midwest's name even though Hicks paid for them.[1] Hicks then leased the trailers to Midwest in two lease agreements dated June 27 and July 7, 2000, again signed by Midwest's secretary. Under those leases, Midwest agreed to pay Hicks $450 per trailer per month for three years; Hicks then planned to pay GE Capital the additional $227 per trailer due on the loans.[2] It is undisputed that Michael and Diane Witters did not participate in or approve any of these transactions.

On July 25, 2001, the state court appointed Donald Hoagland as interim receiver of Midwest based on findings of misconduct, "including large sums paid to Hicks for trailers leased by him to the corporation." Hoagland then dismissed Hicks from Midwest and ceased paying him for the 100 trailers still in Midwest's possession. Hicks

---

[1] Hicks maintained it was a clerical error. Ownership of the trailers was disputed at least through summer 2002 and was not formally resolved until the district court granted permission to transfer title to Hicks on July 2, 2003.

[2] Because these trailers generally have a life span much longer than three years and the leases contained no option for Midwest to purchase, Hicks could make up for this short-term loss on the payments in the long-term profits he could reap from owning the trailers.

brought a motion in state court in October 2001 to order Midwest to pay on the leases or return the trailers to Hicks. Hoagland refused to pay Hicks, arguing both that the trailers were titled in Midwest's name and that the leases violated the Illinois Director Conflict of Interest statute, 805 ILL. COMP. STAT. 5/8.60, which requires authorization from a majority of disinterested shareholders or directors when an interested director seeks to engage in a business transaction with the corporation. The state court denied Hicks's motion on grounds that both title to the trailers and the legitimacy of the leases remained in dispute. The court further instructed Hoagland to maintain possession of the trailers pending resolution of the dispute and suggested that Midwest send the $450 payments directly to GE Capital, which Midwest did from December 2001 through June 2002. Hicks failed to make any payments to GE Capital between July 2001 and February 2002.

On February 8, 2002, GE Capital filed suit in the Southern District of Illinois against Hicks, Midwest, and Hoagland seeking to foreclose on the loans, obtain possession of the trailers, and recover money due.[3] Hicks admitted GE Capital's allegations but cross-claimed against Midwest and Hoagland on a number of theories arising out of Midwest's continued possession of the trailers and failure to make lease payments to Hicks. Those claims, all governed by Illinois law, included two counts of breach of lease, indemnification and contribution, quantum meruit, conversion, a petition to quiet title, and tortious interference with a business contract. The district court exercised supplemental jurisdiction over Hicks's

---

[3]  GE Capital sued Midwest in its capacity as guarantor of Hicks. GE Capital's complaint states that Midwest had paid approximately $90,000 directly to GE Capital as of February 2002.

cross-claims pursuant to 28 U.S.C. § 1367(a). Hicks subsequently settled with GE Capital by paying off the amount due, after which the loans were reinstated.

As the cross-claim litigation continued, the district court concluded that Hicks had the superior right to possession of the trailers and on July 3, 2002, ordered Midwest to return all trailers to Hicks by July 15, 2002. Midwest was slow in complying and failed to return some trailers until late August, prompting a motion from Hicks for contempt damages. The court granted Hicks's motion and referred the case to a magistrate judge to determine the appropriate amount of damages. Contempt damages were assessed in two phases—the first for costs resulting from the delay in returning the trailers, for which Hicks was awarded $48,986.75, and the second for repairs necessitated by the condition in which the trailers were returned, for an amount to be determined with the aid of a special master. On August 8 and November 11, 2003, the magistrate judge entered orders setting forth how the phase two damages determination would proceed and stating that "[i]n the event the Court does not award Hicks damages for items claimed in Hicks' pending Motion, Hicks reserves the right to seek any such uncompensated damages to the trailers, costs for repair or other elements of damage in the underlying case." The phase two damages proceedings concluded with an order entered on March 11, 2004, stating that the parties had agreed to settle for a lump sum payment of $100,000.

Soon after this settlement, Hicks submitted discovery requests to Midwest in an attempt to facilitate a claim for additional compensation for physical damages to the trailers based on the reservation of rights language found in the August 8 and November 11, 2003 orders. Midwest objected on grounds that further compensation was precluded by the March 11, 2004 settlement, which

purported to cover all physical damages. The magistrate judge agreed and issued another order concluding that Hicks had settled all claims for physical damages to the trailers in the March 11 agreement and could pursue no further discovery.

In the meantime, Hicks filed a motion for summary judgment on some of his cross-claims. With no objection from Midwest, the district court granted Hicks's claim to quiet title to the trailers. The remaining claims were then stayed pending resolution of the state-court derivative suit. Shortly after the state-court litigation concluded and the stay was lifted, Midwest and Hicks filed cross-motions for summary judgment on all remaining claims except quantum meruit. Midwest contended that Hicks's leases were invalid under the Illinois Director Conflict of Interest statute because the Witters did not authorize either lease and because the leases did not reflect fair market value. Hicks argued that Hoagland had implicitly validated the leases by maintaining possession of and continuing to use the trailers after he was appointed receiver. Hicks also submitted an affidavit stating that the fair market value of postal trailers ranges from $360 to $600 a month. On September 1, 2005, the district court granted summary judgment to Midwest on all claims except quantum meruit. The court concluded (1) that Hoagland had not validated the leases by retaining the trailers because he had continuously challenged their validity and only maintained possession under the direction of the state court, and (2) that Hicks had failed to carry his burden of coming forward with evidence to create a triable issue of fact on the fairness of the leases under the Illinois statute.

The parties then agreed to settle the quantum meruit claim for a lump sum that broke down to $400 per trailer per month for Midwest's unpaid use. Hicks now appeals the summary judgment dismissing his claims for breach

of lease, indemnification and contribution, conversion, and tortious interference with a business contract in hopes of recovering the monetary difference between the leases and the quantum meruit settlement.[4] He also appeals the district court's denial of his discovery request aimed at securing additional recovery for physical damage to the trailers.

## II.  Discussion

We review a district court's entry of summary judgment de novo, viewing the facts in the light most favorable to the nonmoving party. *Ruffin-Thompkins v. Experian Info. Solutions, Inc.*, 422 F.3d 603, 607 (7th Cir. 2005). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). Although the moving party bears the burden of proving that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the nonmoving party "retains the burden of producing enough evidence to support a reasonable jury verdict in [its] favor." *Ruffin-Thompkins*, 422 F.3d at 607.

## A.  Applicability of the Illinois Statute

Hicks's first two claims are for breach of lease based on Illinois contract law. The district court granted summary

---

[4] At this point, there is no distinction in the remaining claims between Midwest and Hoagland in terms of their liability. Accordingly, we refer to them interchangeably for that purpose.

judgment for Midwest on these claims on the basis of the Illinois Director Conflict of Interest statute, which states in relevant part:

> (a) If a transaction is fair to a corporation at the time it is authorized, approved, or ratified, the fact that a director of the corporation is directly or indirectly a party to the transaction is not grounds for invalidating the transaction or the director's vote regarding the transaction; provided, however, that in a proceeding contesting the validity of such a transaction, the person asserting validity has the burden of proving fairness unless:
>
> > (1) the material facts of the transaction and the director's interest or relationship were disclosed or known to the board of directors or a committee of the board and the board or committee authorized, approved or ratified the transaction by the affirmative votes of a majority of disinterested directors, even though the disinterested directors be less than a quorum; or
> >
> > (2) the material facts of the transaction and the director's interest or relationship were disclosed or known to the shareholders entitled to vote and they authorized, approved or ratified the transaction without counting the vote of any shareholder who is an interested director.

805 ILL. COMP. STAT. 5/8.60(a). It is undisputed that Midwest's other two shareholders, one of whom was also the only other director, did not authorize the leases with Hicks. Rather, at the time Hicks and Midwest entered into the leases, the Witters had already initiated their derivative suit challenging Hicks's authority to enter into precisely these kinds of leases. According to the statute, Hicks, as the person asserting the validity of the leases, has the burden of proving their fairness.

On appeal, Hicks makes two threshold arguments challenging the applicability of the statute. First, he claims the statute can only be used offensively by a corporation challenging the director accused of profiting from the interested transaction, i.e., in a derivative lawsuit. We initially note that Hicks did not make this argument in the district court, and arguments not raised before the district court are waived on appeal. *See, e.g.*, *Belom v. Nat'l Futures Ass'n*, 284 F.3d 795, 799 (7th Cir. 2002). The argument is meritless in any event. The statute provides that "in a proceeding contesting the validity of [an interested] transaction, the person asserting validity has the burden of proving fairness," § 5/8.60(a); the statute does not limit the proceedings in which it may be invoked, nor is there any language limiting its applicability to suits brought by the corporation against the interested director. Nothing in the statute suggests it is inapplicable as a defense against the validity of a transaction in the context of a breach-of-lease claim. Hicks has not identified a single Illinois case supporting his proposed interpretation of the statute. Accordingly, we conclude the statute is applicable as a defense as well as a ground for attacking a transaction.

Hicks alternatively argues that Midwest is bound by the leases regardless of their validity because Hoagland kept and continued to use the trailers after his appointment as receiver. Hicks relies upon *Toushin v. Gonsky*, 395 N.E.2d 1124, 1130 (Ill. App. Ct. 1979), but the case is factually distinguishable from this one. The receiver in *Toushin* had challenged the validity of two movie theater leases on the ground that the shareholder who had signed on behalf of the closely held company lacked sufficient authority due to a pending action for accounting and dissolution. While this action was pending, the receiver retained possession of the theaters without making lease payments and did not respond to letters from the lessee

informing him that rent payments were outstanding. *Id.* at 1126. The receiver also treated the leases as valid in reports to the court, which included amounts for rent due on the leases as unpaid bills. *Id.* at 1130.

On the foregoing facts, the Illinois appellate court concluded that "[a]lthough the receiver challenged the validity of the leases based on [the alleged agent's] authority to bind [the corporation], the continued possession o[r] use of the premises was an election to adopt the lease. *Without reaching the merits of the issue of the validity of the leases*, it is clear that rent and other charges have accrued for the period of the receivership." *Id.* (emphasis added). The court further held that "[i]f the receiver remains in possession beyond a reasonable time to make the election [to adopt or challenge a lease made prior to his appointment], he elects to adopt the lease by implication, and is bound by its terms." *Id.*

*Toushin* thus establishes that under Illinois law, a receiver's implied acceptance of a lease *may* trump the lease's invalidity in some circumstances. But the circumstances here are very different. In *Toushin*, the receiver treated the leases as valid during the time in which he failed to make payments, and he did not challenge their validity until a court action was brought to repossess the theaters. Moreover, the validity of the leases in *Toushin* had nothing to do with the underlying litigation that led to the receiver's appointment. Here, in contrast, the challenge to the validity of the leases was not only in existence when Hoagland took over as receiver, but Hicks's practice of entering into insider leases was actually one of the reasons for the appointment of a receiver in the first place. *See Witters v. Hicks*, 780 N.E.2d 713, 720 (Ill. App. Ct. 2002) (listing as a reason for appointment that "Hicks' leasing of trailers owned by him to [Midwest] constituted a conflict of interest as set forth in section 8.60").

Moreover, when Hicks initially challenged Midwest's failure to pay the leases, the state court directed Midwest not to return the trailers and suggested that Midwest make lease payments directly to GE Capital until ownership of the trailers and the validity of the leases could be determined. At the October 12, 2001 hearing on Hicks's motion, the court specifically noted: "[W]e have the validity of the leases themselves in controversy. The burden of proof is on Mr. Hicks to show that these were entered into fairly, and that is something we'll take up at trial."

Accordingly, unlike in the receiver in *Toushin*, Hoagland never accepted the validity of the Hicks leases and challenged them from the moment he learned of their existence. In addition, at the time of Hoagland's actions, there was legitimate confusion regarding whether Hicks or Midwest was the rightful owner of the trailers, so Hoagland was under no clear duty to return or pay for the trailers. This was, as we have noted, one of the factors cited by the state court in its conclusion that Midwest should make payments directly to GE Capital instead of to Hicks. It is abundantly clear that Hoagland never acted in a manner that would support a conclusion that he adopted the leases by implication.

Hicks also cites *Spencer v. World's Columbian Exposition*, 45 N.E. 250 (Ill. 1896), an early Illinois Supreme Court case, but that case actually supports the receiver's position here. *Spencer* involved a receiver who had maintained possession of leased premises for the final months of the World's Columbian Exposition; the Illinois Supreme Court held that under the circumstances, the receiver could not subsequently avoid payment by claiming the lease terms were too high. *Id.* at 253. However, the court noted that the receiver's failure to contest the validity at the time he maintained possession of the premises was dispositive:

> [W]e have been referred to no cases holding that, where the lease or contract is of itself a thing of value to the creditors, and the receiver, under the order of the court, takes possession of the premises, and conducts the business which the insolvent had been unable to continue, and, *without any act of disaffirmance or notice that he would not be bound by the contract*, completes the term, and receives profits, and all the benefits, from such possession and continuance of the business, the receiver may then repudiate the contract, and pay only on the basis of a quantum meruit.

*Id.* (emphasis added). *Spencer* thus stands for the proposition that a concurrent challenge to the validity of a lease prevents a receiver's continued possession from trumping the invalidity of the lease. The district court properly rejected Hicks's argument that Hoagland implicitly validated the leases.

## B. Fairness of the Leases

The remaining question on the validity of the leases is whether Hicks carried his burden of demonstrating a genuine issue of material fact as to their fairness. Hicks's summary judgment motion attached two leases for comparison, as well as an affidavit from another leasing agent regarding the fair market value of postal trailers. Hicks did not develop an argument based on these documents, however; instead, he repeatedly asserted before the district court that the only issue it needed to consider was his argument about the receiver. But Hicks had "the burden to point to . . . information to show that a genuine issue of fact exist[s]; the district court 'need not scour the record' to find such evidence." *Ruffin-Thompkins*, 422 F.3d at 610 (quoting *L.S. Heath & Son, Inc. v. AT&T Info. Sys., Inc.*, 9 F.3d 561, 567 (7th Cir. 1993)). We are

tempted to conclude that Hicks abandoned that task by not developing an argument about how the documents he submitted related to his burden of proving fairness. In an abundance of caution, however, we will evaluate the limited evidence Hicks submitted.

"Illinois defines 'fair' as market value. A transaction is 'fair' to a corporation when it receives at least what it would have obtained following arms' length bargaining in competitive markets." *Olsen v. Floit*, 219 F.3d 655, 657 (7th Cir. 2000) (citing *Shlensky v. S. Parkway Bldg. Corp.*, 166 N.E.2d 793 (Ill. 1960)). Hicks submitted three documents potentially relevant to fairness: an affidavit stating that the fair market value for a postal trailer ranges from $360 to $600 per month and two leases Midwest entered into with other companies after Hoagland was appointed receiver. The affidavit is too generalized to raise an issue of fact regarding the fairness of the particular leases in question in this case. The first of the two comparison leases, a three-year lease with Rightway Trucking Co., provided Midwest with trailers at a rate of $250 per trailer per month, substantially lower than the Hicks leases.[5] The lease also included an option to purchase, which was not available in the Hicks leases. Without additional information regarding the comparative quality or age of the Rightway trailers, which Hicks did not provide, there is nothing in this lease that would support a conclusion that Hicks's $450-per-trailer rate was fair.

The second lease was between Midwest and XTRA Lease. It is a short-term lease of an entirely different nature in which trailers were provided for daily and weekly rates.

---

[5] Rightway Trucking was owned by the Witters. Accordingly, before entering into this insider transaction, Hoagland obtained the permission of the state court.

The district court noted during the contempt proceedings that short-term trailer rental rates are often higher than long-term rates; this explains why Hicks was compensated at a rate of $450 per trailer in the contempt proceedings for the short-term continued possession of his trailers, but received only $400 per trailer in the quantum meruit settlement for the long-term use that occurred prior to the July 2002 order mandating the trailers' return. Hicks has not provided any information regarding how the market value for short-term leases such as those entered into with XTRA compares with that of the long-term leases entered into with him. He also has not provided any information regarding the comparative age and quality of the trailers XTRA offered.

By contrast, Midwest submitted three long-term leases it has entered into since returning Hicks's trailers. Each lease contains an option to purchase and carries a significantly lower rate ($285, $185, and $225 per trailer per month) than the Hicks leases. Midwest also submitted an affidavit from its operations manager stating that the XTRA lease rate was higher than all of Midwest's other leases because it was a short-term rate. Finally, Midwest included a document from the state court containing its bench trial finding that Hicks had failed to prove that any trailer leases he entered into with Midwest since 1993 were fair under section 5/8.60. As we have discussed, Hicks has the burden of proving that a reasonable jury could find in his favor on the issue of fairness; his evidence is insufficient to create a genuine factual dispute regarding the fairness of the leases.

## C. Remaining Claims

Hicks's remaining contract claims are meritless and require little discussion. His contribution and indemnification claims arise out of the language of the leases; because

the district court correctly concluded that the leases were invalid, these claims fail as a matter of law. Similarly, there is no legal support for Hicks's conversion claim because the state court instructed Midwest to maintain possession of the trailers, establishing that Hicks did not have an absolute and unconditional right to possession of the trailers. The only period in which Midwest maintained control without permission was the two-month delay in returning the trailers pursuant to the court's order, and Hicks was compensated for all damages resulting from that delay through the contempt proceedings. Finally, Hicks's tortious interference with a contract claim requires Hicks to show that GE Capital was induced by Midwest's behavior to breach its loan agreements with Hicks. But Hicks—not GE Capital—breached the loan agreements, so this claim was also properly rejected.

## D. Discovery Issue

Hicks's remaining argument on appeal pertains to his last-ditch effort to increase his recovery for physical damage done to the trailers while they were in Midwest's possession. Hicks now contends the March 11 agreement to settle the contempt damages for $100,000 was intended only "to get the Trailers in a usable condition," not "to encompass all damages that Hicks may be entitled to under industry leasing standards or under the Hicks Leases." He further claims his right to secure additional damages was explicitly preserved by the language of the earlier orders of the magistrate judge.

Neither of these contentions are supported by the district court record. The August 8 order specified that "the court shall consider and assess the damages incurred by Hicks as a result of the condition of the trailers when delivered to Hicks . . . including the costs to complete repairs, attorney's fees, loss of use, storage charges, and

*any other damages* sought in Hicks' Motion." (Emphasis added.) The magistrate appointed a special master to assess damages, and the standards by which they were assessed included applicable Department of Transportation and Federal Motor Carrier Safety Administration regulations, as well as "applicable rules and regulations promulgated by the United States Postal Service for contractors hauling mail." This language directly contradicts Hicks's claim that the damages did not contemplate industry leasing standards. Further, the damages order ultimately entered by the court stated that the parties had "amicably resolve[d] the physical damages to the trailers" for $100,000, and Hicks submitted a satisfaction to the court on March 25, 2004, asserting that Midwest "paid and satisfied the Phase II contempt damages." These documents establish that Hicks conclusively settled his entire claim for compensation for physical damages in the March 11 settlement. As such, the district court did not abuse its discretion in denying Hicks's discovery requests aimed at augmenting his settlement recovery.

AFFIRMED.

A true Copy:

      Teste:

                _____

                *Clerk of the United States Court of*
                    *Appeals for the Seventh Circuit*