In the

# United States Court of Appeals
## For the Seventh Circuit

No. 19-2787

BRAD SANDEFUR,

*Plaintiff-Appellant,*

*v.*

THOMAS J. DART and COOK COUNTY, ILLINOIS,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:17-cv-02048 — **Manish S. Shah**, *Judge.*

ARGUED SEPTEMBER 18, 2020 — DECIDED NOVEMBER 4, 2020

Before SYKES, *Chief Judge*, and HAMILTON and ST. EVE, *Circuit Judges.*

HAMILTON, *Circuit Judge.* Plaintiff Brad Sandefur is a corrections officer for the Sheriff of Cook County, Illinois. He suffers from disk desiccation in his spine and osteoarthritis in his knees. Both conditions can cause him intermittent pain for weeks at a time. In 2011, Sandefur applied for and received a handicapped parking placard from the Illinois Secretary of

State. His application identified his qualifying disability as osteoarthritis or a "knee condition." The application asserted that he could not walk without using an assistive device such as a cane or walker or receiving help from another person, and that the impairment was permanent.

In 2015, however, at age 55, Sandefur applied for and was accepted to the Cook County Sheriff's Police Academy, which offered a path for him to move from corrections officer to a job as a police officer with the Sheriff. On the first day of training, an instructor noticed the handicapped parking placard hanging from the rearview mirror of Sandefur's car. When the instructor asked about the placard, Sandefur said it was there for his wife. When a second officer asked about the placard, Sandefur said that it was his wife's but that he also used it. Wanting to confirm that Sandefur was medically cleared to participate in the Academy's physical training, Academy officials met with Sandefur. He explained that his doctor had approved the placard because of his osteoarthritis but that he was not requesting any accommodations in the Academy course.

In the face of Sandefur's inconsistent explanations, the Sheriff's Office eventually opened a formal investigation into his acquisition and use of the placard. Sandefur's explanations did not improve or become more consistent. For example, Sandefur said that he believed his initial placard application had been authorized for the wrong condition and admitted that he had used his placard for years based on convenience rather than medical necessity.

Toward the end of the investigation, the lead investigator concluded that Sandefur had demonstrated an "inability to provide truthful responses to basic questions." Emphasizing

that the Sheriff's police officers are held to "the highest standards" and required to "lead by example," the officer recommended that Sandefur be dismissed from the Academy. Based on these findings, the Sheriff's Office dismissed Sandefur from the Academy and returned him to his job as a corrections officer.

Sandefur has sued Sheriff Thomas J. Dart and Cook County (together, the "Sheriff's Office") for violating the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12112, and his due process rights under the Fourteenth Amendment. The district court granted summary judgment for the Sheriff's Office, concluding that it had dismissed Sandefur based on its honest belief that he had lied about his disability, not because he had a disability, and that Sandefur had offered no evidence of a due process violation. *Sandefur v. Cook County*, No. 17 cv 2048, 2019 WL 3825509 (N.D. Ill. Aug. 15, 2019). We affirm. We address first the ADA claim and then the due process claim.

I.  *Plaintiff's ADA Claim*

    A.  *Facts for Purposes of Summary Judgment*

        1.  *Plaintiff's Medical Conditions*

Because Sandefur appeals from a grant of summary judgment, we must view the evidence in the light reasonably most favorable to him and give him the benefit of conflicts in the evidence. *Greengrass v. Int'l Monetary Systems Ltd.*, 776 F.3d 481, 485 (7th Cir. 2015). We do not vouch for the objective truth of every fact that we must assume to be true for purposes of the appeal. *KDC Foods, Inc. v. Gray, Plant, Mooty, Mooty & Bennett, P.A.*, 763 F.3d 743, 746 (7th Cir. 2014).

Plaintiff Sandefur has been employed by the Sheriff's Of-
fice since February 1990. In 1996, he became a correctional ser-
geant in the Department of Corrections. Since 1995, Sandefur
has suffered from disk desiccation in his back and osteoarthri-
tis in his knees, and both conditions can cause him intermit-
tent pain for weeks at a time. When his conditions flare up, he
experiences limited mobility and severe pain. At work, how-
ever, Sandefur has never requested or received accommoda-
tions for either condition. At most, he has used compensatory
time and leave when his conditions flare up.

In 2011, Sandefur applied for and received a handicapped
parking placard based on his osteoarthritis. The application,
completed by Sandefur and his physician, Dr. Stephen
Behnke, said Sandefur could not walk "without the assistance
of another person, prosthetic device, wheelchair, or other as-
sistive device," and that Sandefur was "severely limited in
[his] ability to walk due to an arthritic, neurological, or ortho-
pedic condition." The application described Sandefur's disa-
bility as permanent. In August 2013, Sandefur renewed his
application, again citing his osteoarthritis as the qualifying
condition.

2. *Sandefur's First Day at the Academy*

In 2015, Sandefur applied and was accepted to the Sheriff's
Police Academy. He was 55 years old. As part of the training,
the Illinois Law Enforcement Training and Standards Board
requires recruits to pass the Peace Officer Wellness Evalua-
tion Report, known as the "P.O.W.E.R. Test," which has four
elements. First, recruits take a "Sit and Reach Test," which
measures flexibility in the lower back and upper legs. They
must also do as many sit-ups as possible within one minute

and see how much weight they can bench-press once. The final test is a timed run of 1.5 miles. A male recruit in the 50–59 age range must complete the run in less than 16 minutes and 21 seconds. On June 19, 2015, Dr. Behnke completed a medical release form certifying that Sandefur was able to perform the P.O.W.E.R. Test with "no restrictions."

Sandefur's first day at the Academy, July 6, 2015, began with an inspection of each recruit's equipment, personal vehicle, and attire. An adjunct instructor, Investigator Jeffrey Lange, inspected Sandefur's vehicle and noticed a handicapped parking placard hanging from the rearview mirror. He asked Sandefur about it. Sandefur said that it "was there for his wife," who had gone out with Sandefur the night before. Lange yelled at Sandefur about the illegal use of his wife's placard. Sandefur then explained that he was handicapped too and sometimes used the placard as well. Lange asked Sandefur how he could simultaneously require a handicapped placard and perform all the requirements of a police officer. Sandefur said that his condition would not affect his performance as an officer. At some point during the exchange, Lange exclaimed to the surrounding group, "can you believe this, now they're sending handicapped m*****f*****s to the Academy."

Sergeant David Cammack, the Academy's supervisor, was also present for inspections that morning. Lange told Sergeant Cammack that Sandefur was displaying a handicapped parking placard in his personal vehicle. At that point, Sergeant Cammack took over the inquiry and asked Sandefur if the placard belonged to him. Sandefur replied that it belonged to his wife.

After completing the remaining inspections, Sergeant Cammack relayed the information about Sandefur's placard to his supervisor, Lieutenant Nathan Camer, second-in-command at the Academy. Sergeant Cammack said that in light of the significant physical training beginning that same day, they should consider whether Sandefur had any physical limitations. Upon inquiry, Human Resources reported that Sandefur had been medically cleared for the Academy and had not requested accommodations.

Later that day, Sergeant Cammack and Lieutenant Camer met with Sandefur to discuss whether he was requesting any accommodations while at the Academy. Sandefur said he was not. He added that the handicapped placard was for his wife, but that he also used it for his own medical condition. Lieutenant Camer then asked Sandefur to complete a "Law Enforcement Official's Request for Protected Health Information" form to authorize Dr. Behnke to provide Sandefur's medical records.

Following that meeting, Sandefur gave Sergeant Cammack a handwritten memorandum that said in relevant part: "The placard was approved by my doctor, Doctor Behnke, in 2015. The placard is for an arthritic knee condition. This condition will not affect my ability to perform my duties at the Cook County Sheriff's Police Academy or as a Cook County Sheriff's Police Officer."

3. *ISS Investigation and Dismissal from the Academy*

Also on July 6, 2015, Lieutenant Camer sent a memorandum to Brian White, the Executive Officer of the Cook County Sheriff's Police Department, about his meeting with Sandefur. White asked Police Inspector Theodore Stajura of the Police

Department Inspectional Services Section ("ISS"), to investigate Sandefur's conflicting statements about his placard.

ISS Deputy Inspector Michael Goldsmith reviewed reports from Lange, Sergeant Cammack, and Lieutenant Camer, obtained medical records from Dr. Behnke, and contacted the Illinois Secretary of State Police. A review of Sandefur's medical records did not reveal a diagnosis for either a knee or back condition. On July 24, 2015, ISS filed a Complaint Register against Sandefur. On July 27, 2015, the Sheriff's Office instructed ISS to open a formal Management Inquiry against Sandefur to determine whether he had been untruthful when applying for a State of Illinois handicapped parking placard.

On August 4, 2015, as part of the Management Inquiry, ISS interviewed Sandefur. Interviewing officers included Inspector Stajura, Inspector Goldsmith, and Sergeant John Sullivan. During the interview, Sandefur said that he had first told Lange that the placard in his vehicle belonged to him but was currently being used by his wife, not that the placard belonged to his wife, as Lange had reported. Sandefur also said that during his July 6, 2015 meeting with Sergeant Cammack and Lieutenant Camer, he had told them that he did not need his placard anymore because his condition had improved. Sandefur also told the officers that Dr. Behnke should have authorized the placard based on his disk desiccation, not the osteoarthritis in his knees. Sandefur conceded that he had not tried to correct this error with the Illinois Secretary of State.

Sandefur also told the interviewing officers that when he worked at the Department of Corrections, he would park in a handicap-designated space approximately three times per week, and he admitted that he sometimes parked in those spaces for "convenience." He immediately tried to minimize

this admission by suggesting that other employees also parked in handicap-designated spaces out of convenience. Returning to his physical health, Sandefur explained that although his application for the parking placard described his disability as "permanent," his condition had improved over the last nine months and he no longer required the placard. Sandefur also said that he did not understand how Dr. Behnke could medically release him to participate in the Academy if he suffered from such a serious and permanent disability limiting his ability to walk. That is indeed one of the mysteries of this case, and the evidence does not answer it.

On August 13, 2015, Sergeant Sullivan received a follow-up memorandum from Sandefur. Sandefur wrote that he had been unable to remember pertinent information during the August 4, 2015 interview and had provided inaccurate answers as a result. Sandefur said that his physical self-assessments during the interview were based on his current, improving condition. He said that in 2011, when he first applied for the handicapped parking placard, he often used a cane, leaned on walls, or walked abnormally to compensate for his conditions. The 2011 application had been accurate at the time, he said. Sandefur further said that the qualifying condition on his application should be based on the advice of a medical professional rather than his personal beliefs. Finally, Sandefur said that his condition had improved over only the last three to four months, not the last nine months.

On September 3, 2015, as part of the ongoing Management Inquiry, Sergeant Sullivan sent a memorandum to Inspector Stajura detailing the various inconsistent statements provided by Sandefur at each step of the inquiry. Sergeant Sullivan concluded that Sandefur's conduct demonstrated an "inability to

provide truthful responses to basic questions," which "clearly calls into question his integrity and his ability to function as a member of the Cook County Sheriff's Police Department."

On September 10, 2015, Sergeant Sullivan wrote a memorandum explaining that Sandefur had: (1) knowingly submitted an inaccurate handicapped parking placard application to the Illinois Secretary of State; (2) made no attempt to correct the inaccuracy; (3) admitted to parking in handicapped spaces out of convenience; and (4) presented conflicting justifications for his placard during his August 4 interview and in his August 13 supplemental memorandum. Sullivan concluded that Sandefur's false actions and statements violated several Sheriff's Office rules and regulations, including engaging in conduct that discredited the integrity of the Sheriff's Office and providing false or misleading statements during a work-related investigation. Sergeant Sullivan recommended that Sandefur be dismissed from the Academy and not permitted to become a Sheriff's police officer. Inspector Stajura agreed with Sergeant Sullivan's recommendation and reported the findings of the Management Inquiry to First Deputy Chief of Police Dana Wright. In turn, Wright approved Inspector Stajura's recommendation, and Sandefur was returned to his job as a corrections officer.

B. *Applicable Law Under the ADA*

The Americans with Disabilities Act prohibits covered employers from discriminating against individuals with disabilities. 42 U.S.C. § 12112(a). To establish an ADA discrimination claim, Sandefur must show that he: (1) was disabled within the meaning of the ADA; (2) was qualified to perform the essential functions of the relevant job either with or without reasonable accommodation; and (3) suffered an adverse

employment decision because of his disability. *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014). The district court found that Sandefur failed to offer evidence that would allow a reasonable jury to find that he was removed from the Academy because of his disability. "All told," the court concluded, "the evidence is that Sandefur was dismissed from the academy because defendants believed that he lied about his disability." *Sandefur*, 2019 WL 3825509, at *3. The district court rejected Sandefur's argument that a jury could find that the Sheriff's Office's stated reason for dismissing him was false (i.e., pretextual).

Sandefur argues on appeal that the Sheriff's Office violated the ADA in multiple ways, including: (1) dismissing him from the Academy because of a real or perceived disability; (2) performing an unlawful medical inquiry; (3) launching impermissible disability-related inquiries in concert with the Illinois Secretary of State Police; (4) failing to engage in the interactive process expected in dealing with requests for reasonable accommodations for disabilities; (5) discriminating through the unlawful use of medical information; and (6) pursuing revocation of Sandefur's handicapped parking placard. Sandefur also argues that his evidence of animus against persons with disabilities on the part of Investigator Lange tainted the entire investigation into his placard and that the district court made a legal error in allotting the burden of proof on his ADA claims.

   1.  *Sheriff's Office's Alleged ADA Violations*

Sandefur's core ADA claim is that he was dismissed from the Academy, and thereby lost an opportunity for promotion, because the Sheriff's Office regarded him as having a disabil-

ity. Before addressing that core claim, however, we first address Sandefur's claims that the Sheriff's Office violated the ADA by seeking information from him, from his doctor, and from the Illinois Secretary of State regarding his physical condition and his application for the handicapped parking placard.

The ADA limits the ability of covered employers to investigate the health of their employees or to test their physical fitness. 42 U.S.C. § 12112(d); 29 C.F.R. § 1630.13. These provisions of the ADA strike a balance. On one hand, the law protects employees with disabilities from being screened out of jobs they could perform with or without reasonable accommodations. On the other hand, many jobs are physically demanding, and employers are entitled to evaluate whether applicants for those jobs are physically capable of performing them. The key point in § 12112(d)(3) and (d)(4) is that such tests and requirements must be job-related and "consistent with business necessity." See generally, e.g., *Kurtzhals v. County of Dunn*, 969 F.3d 725, 731 (7th Cir. 2020) (plaintiff was police officer responsible for public safety, so employer "had a particularly compelling interest in assuring that [he] was both physically and mentally fit to perform [his] duties"); *Wright v. Illinois Dep't of Children & Family Servs.*, 798 F.3d 513, 523 (7th Cir. 2015) (applying § 12112(d)).

Police officers hold jobs with relatively high physical demands, at least for many job categories and classifications. It is difficult for us to imagine, for example, how a person who cannot walk without assistance could perform the essential functions of a patrol officer. Many employers might have little or no business investigating an employee's or applicant's use of a handicapped parking placard, but a police force would

seem to have good reason to raise the questions that the Sheriff's Office raised here about Sandefur's ability to meet the physical demands of the Academy and working as a police officer.

In addition, there is a line of cases under the ADA in which courts have held that an employer had a duty to consider whether an employee needed an accommodation even where the employee had not asked for one. E.g., *Bultemeyer v. Fort Wayne Community Schools*, 100 F.3d 1281, 1285 (7th Cir. 1996) (reversing summary judgment for employer: "The employer has to meet the employee half-way, and if it appears that the employee may need an accommodation but doesn't know how to ask for it, the employer should do what it can to help."). The apparent tension between applying for a physically demanding job such as a police officer and using a handicapped parking placard based on an inability to walk without assistance might induce a reasonable employer to look into the matter.

We decline to wrestle these questions to the ground, however. Sandefur did not raise in the district court his claims that the Sheriff's Office violated the ADA by asking questions and investigating his medical records and his application for the parking placard. He thus waived those claims. See *Hicks v. Midwest Transit, Inc.*, 500 F.3d 647, 652 (7th Cir. 2007). For the same reason, Sandefur also waived his claim that the Sheriff's Office failed to engage in the "interactive process" that the ADA contemplates for resolving an applicant's or employee's need for a reasonable accommodation, though the claim is an odd one here. Sandefur has always contended in this case that he did not need any accommodation to go through the Academy or to work as a police officer.

Turning to the core claim of discrimination, we agree with the district court that Sandefur failed to offer evidence that would support a finding that he was removed from the Academy because of his disability, real or perceived. Given Sandefur's conflicting statements, arguments, and justifications for his handicapped parking placard, as well as the nature of the work he was seeking and the importance that a police officer be honest and obey the law, it was only natural, and not a violation of the ADA, for the Sheriff's Office to seek further information and clarification.

Recall that Sandefur first told Lange that the parking placard was "for his wife," but then said that he sometimes used the placard because he was handicapped too. He then told Sergeant Cammack that the placard belonged to his wife. He then told Sergeant Cammack and Lieutenant Camer that the placard was for his wife, but he then immediately backpedaled, saying that he too used the placard for a medical condition. He followed up with Sergeant Cammack later that day in a handwritten memo explaining that his physician approved his use of the placard for a knee condition in 2015—even though he first applied for the placard in 2011. Sandefur offered all those answers on July 6 alone.

Sandefur's conflicting explanations did not end that day. In the interview on August 4, he claimed that his placard should have been authorized for his back condition, but he also acknowledged that he had not yet tried to correct this error. He also admitted that he sometimes parked in handicap-designated spaces out of convenience. He then tried to minimize that admission by claiming that other Department of Corrections employees did the same. Most significant, Sandefur said that he did not understand how Dr. Behnke could

sign his medical release form for the Academy while previously attesting to his permanent disability. Neither do we. Surely, then, Sandefur could not have been too surprised that the interviewing officers also saw a contradiction and ultimately sustained the charge that he had not been truthful in the inquiries.

We stress, however, that our analysis depends on the fact that Sandefur was seeking a law-enforcement job with demands for both physical fitness and integrity. As the P.O.W.E.R. Test indicates, each Academy recruit must satisfy physical-fitness requirements to become a police officer. These requirements help to safeguard officers themselves, their colleagues, and the general public. Second, a law-enforcement employer has a strong interest in ensuring that its employees obey the laws that they are responsible for enforcing. As Sergeant Sullivan's September 3, 2015 memorandum emphasized, Sheriff's Office Police Officers are held to the "highest standards," must "lead by example," and "hold true to the integrity required" by the role.

In Sandefur's case, these two concerns, physical fitness and integrity, are both present. So while most employers would be well-advised to look at 42 U.S.C. § 12112(d) before investigating an employee's use of a handicapped parking placard, Sandefur has not offered evidence that would allow a jury to find that the Sheriff's Office's investigation violated the ADA. The undisputed facts show that Sandefur failed to provide a consistent account of his reasons for having and using a handicapped parking placard.

We agree with the district court that the undisputed facts show that the decision to dismiss Sandefur from the Academy

was based on his inability to give honest and consistent answers to straightforward and legitimate questions, not because of any actual or perceived physical impairment.

### 2. *Evidence of Investigator Lange's Animus*

Sandefur argues, however, that his initial contact with Lange on July 6 showed that Lange harbored an animus against persons with disabilities and that his animus tainted everything that came afterward, including the ultimate decision to dismiss Sandefur from the Academy. Sandefur invokes a version of the so-called "cat's paw" theory of liability, in which one person acts out of unlawful animus and causes higher-ranking decision-makers to take action against another employee. See generally *Staub v. Proctor Hospital*, 562 U.S. 411, 415 (2011); *McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 370 (7th Cir. 2019). An employer can defeat a cat's paw theory by showing that the actual decision-makers took an independent look at the situation and made a decision untainted by the (presumed) unlawful motives of someone else. See *Staub*, 562 U.S. at 421; *Schandelmeier-Bartels v. Chicago Park Dist.*, 634 F.3d 372, 383 (7th Cir. 2011).

We are not convinced. Sandefur's argument overstates Lange's role in the decision to dismiss him. We assume for purposes of argument that Lange's intrusive questioning and reference to Sandefur as a "handicapped m*****f*****" during the vehicle inspection showed unlawful animus on his part. Sandefur argues that because the ultimate decision-makers credited Lange's version of events and cited the vehicle inspection as the first instance of Sandefur's untruthfulness, the investigation itself was tainted. The record does not reasonably support such a finding.

Sergeant Cammack testified that once Lange notified him of Sandefur's placard, the investigation was "kind of turned over to me." And while Sandefur's untruthful statement to Lange may have precipitated the initial investigation, Lange had no further involvement. The formal Management Inquiry came only after Sandefur's meeting with Sergeant Cammack and Lieutenant Camer, as well as a supplemental investigation conducted by ISS and the Illinois Secretary of State Police. There is no evidence that anyone else involved in the investigation or dismissal decision harbored any unlawful animus. The results showed that Sandefur could not answer legitimate questions honestly and consistently.

### 3. *The District Court's Analysis*

Sandefur also argues that the district court made a legal error in discussing his argument that the Sheriff's Office's stated reason for dismissing him from the Academy was a pretext for discrimination against him on the basis of disability. Sandefur frames this argument in terms of an erroneous burden-shifting analysis. As we read the district court's decision, it did not engage at all in a burden-shifting analysis or adapt the analytic framework for circumstantial evidence of discrimination from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), which plaintiff did not rely upon.

Instead, the district court correctly relied on *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 764 (7th Cir. 2016), for the general standard for proving unlawful discrimination with circumstantial evidence. The court did not mention *McDonnell Douglas*. By considering whether Sandefur had offered evidence that the stated reason for removing him from the Academy was a pretext, the district court did not stray from

controlling law. The framework in *McDonnell Douglas* remains one way to prove an employment discrimination claim, including proof that the employer was dishonest about its reasons. But also under the broader test set forth in *Ortiz*, evidence of an employer's dishonesty can help prove unlawful discrimination. E.g., *Graham v. Arctic Zone Iceplex, LLC*, 930 F.3d 926, 929 (7th Cir. 2019) (evidence of pretext relevant under *Ortiz*); *Hitchcock v. Angel Corps, Inc.*, 718 F.3d 733, 737–38 (7th Cir. 2013) (evidence of pretext relevant although plaintiff disclaimed reliance on *McDonnell Douglas* burden-shifting framework).

In any event, we agree with the district court that no reasonable jury could discount the Sheriff's Office's honest belief that Sandefur had been dishonest on the subject of his handicapped parking placard. Because Sandefur has failed to offer evidence that the Sheriff's Office dismissed him from the Academy because of a real or perceived disability, we affirm summary judgment on the ADA claim.

## II. *Due Process Claim*

After the 2015 debacle over the parking placard, Sandefur returned to his job as a corrections officer. In the following year or so, the Sheriff's Office told Sandefur that he would not qualify for several promotions that he sought, including a new application to the Academy. The stated reason was that he was on the Sheriff's Office's so-called *Brady* list, referring to the Supreme Court's landmark decision in *Brady v. Maryland*, 373 U.S. 83 (1963), under which prosecutors in criminal cases must disclose material exculpatory information, including adverse information about a testifying law enforcement officer's credibility. See *Giglio v. United States*, 405 U.S. 150, 154–55 (1972) (when defendant's guilt or innocence hinges on

reliability of a witness's testimony, failure to disclose evidence related to that witness's credibility may result in a *Brady* violation).

Sandefur asserts that putting him on the *Brady* list deprived him of liberty or property without due process of law. He argues on appeal that the district court erred by granting summary judgment for defendants on that claim. We assume but do not decide that putting Sandefur on the *Brady* list had the effect of depriving him of a protected property and/or liberty interest. See generally, e.g., *Strasburger v. Board of Education*, 143 F.3d 351, 355–56 (7th Cir. 1998) (discussing due process liberty interest claims where public employees are fired for public, stigmatizing reasons). The district court did not err in granting summary judgment on this claim.

First, at the most basic level, the Due Process Clause does not prohibit deprivations of life, liberty, or property; it prohibits deprivations of life, liberty, or property without due process of law, meaning notice and a fair opportunity to be heard. *Zinermon v. Burch*, 494 U.S. 113, 125 (1990). In this case, we need not explore the sometimes complex nuances of this area of the law. The letters that told Sandefur he was disqualified from the promotions he was seeking because of the *Brady* list also invited him to seek review. He could dispute the disqualification by contacting the Sheriff's Office Compliance Officer within seven days after receiving the letters. As far as we can tell, Sandefur was offered an opportunity to be heard and did not take advantage of it.

Second, even if an individual who worked in the Sheriff's Office had violated Sandefur's due process rights, Sandefur failed to offer evidence of an unconstitutional policy, custom, or practice sufficient to hold the Sheriff's Office itself liable.

Sandefur seeks damages under 42 U.S.C. § 1983. Unlike the ADA and other employment discrimination laws, under which the proper defendant is the employer itself, § 1983 focuses primarily on individual liability. The local governmental entity itself may be found liable only where a constitutional violation was caused by an unconstitutional policy, custom, or practice under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). The district court correctly found that Sandefur failed to satisfy the *Monell* standard for holding the Sheriff's Office liable for any due process violation.

The judgment of the district court is AFFIRMED.